805 P.2d 641

Eugene WATSON, et al.,
Petitioners–Appellants,

v.

TOWN COUNCIL OF THE TOWN OF
BERNALILLO, et al.,
Respondents–Appellees.

No. 10852.

Court of Appeals of New Mexico.

Jan. 15, 1991.

Paul Bardacke, Stephen Charnas, Sutin, Thayer & Browne, P.C., and Anita P. Miller, Potter & Kelly, Albuquerque, for petitioners-appellants.

George Perez and Orlando Lucero, Poole, Tinnin & Martin, P.C., Albuquerque, for respondents-appellees.

## OPINION

APODACA, Judge.

Petitioner Eugene Watson and others (collectively designated as protestors) appeal the district court's decision affirming certain rezoning action taken by the Bernalillo Town Council (Council) that permitted the construction and operation of a gypsum wallboard manufacturing plant. The issue essentially raised on appeal is whether the Council's action constituted "illegal spot zoning." We hold that it did not and conclude that there was substantial evidence on the whole record to support the Council's rezoning decision. We thus affirm the district court.

FACTS

Centex American Gypsum Corporation (Centex), the operator of the proposed manufacturing plant, presented an annexation petition to the Council. The petition sought the annexation of a narrow strip of approximately sixty-eight acres lying in the Town of Bernalillo's (Bernalillo) "industrial corridor" between I–25 and the railroad tracks that run parallel to I–25. The land is contiguous to the northern boundary of Bernalillo. Centex's annexation request was conditioned on the company obtaining special use zoning for the property to permit the construction and operation of the manufacturing plant. The Council approved annexation of the property and referred the zoning request to Bernalillo's Planning and Zoning Commission (zoning commission).

Centex submitted its zoning application to the zoning commission, together with an environmental impact study that had been prepared for a site located one-half mile north of the proposed location. The district court later concluded that this study was equivalent and relevant to the proposed location. The application was considered at a public hearing by the zoning commission, at which Centex and other interested parties, including protestors, presented their respective views concerning the rezoning and the impact of the proposed plant on the surrounding area. Protestors, who were residents of Bernalillo and the adjoining community of El Llano, and whose property was included in or surrounded the subject property, also submitted a written petition in opposition to the plant. Protestors expressed serious concern over the environmental impact of the plant on the health, safety, morals, and

general welfare of their community. As a basis for their concern, protestors relied on the provisions of NMSA 1978, Section 3–21–1(A) (Repl.1985), with particular emphasis on water well impairment, air pollution, noise, and lighting. The zoning commission, however, voted to recommend approval of the special use zoning for the plant.

Protestors filed an appeal of the zoning commission's recommendation to the Council. After a public hearing, in which both sides again presented their respective positions, the Council voted unanimously to approve the annexation, as well as to pass Ordinance 111 granting special use zoning to the annexed area. The Council's approval was subject to Centex's compliance with fourteen conditions. Protestors then filed a writ of certiorari in the district court, seeking review of the Council's decision. The district court, concluding that the information provided by Centex exceeded that required by Bernalillo's Comprehensive Zoning Ordinance, affirmed the Council's decision. The court then entered its findings of facts and conclusions of law in favor of the Council. The appeal to this court followed.

DISCUSSION

Protestors claim that the "Town of Bernalillo Ordinance 111 is 'spot zoning' and therefore invalid and beyond the authority of the Town Council to enact." Before determining whether the subject ordinance constituted spot zoning, it is necessary that we consider our standard of review, as well as the question of whether spot zoning is contrary to law or "illegal" per se in New Mexico.

■ Although protestors did not raise as an issue the proper standard of review in the district court or preserve it as an issue in their docketing statement, we nevertheless address the issue for two reasons: first, it is necessary for a reviewing court to establish the standard of its review; and second, we wish to express our concern over a second-tier judicial review that duplicates review of the district court. Regarding the latter, we do not suggest a departure from the whole record review as first adopted in *Duke City Lumber Co. v. New Mexico Environmental Improvement Board*, 101 N.M. 291, 681 P.2d 717 (1984); we only invite the supreme court to consider a limitation of that review at the second judicial tier.

■ We determine that the standard of review governing our disposition of this appeal is the same as the standard used by the district court in reviewing the Council's decision. *Groendyke Transport, Inc. v. New Mexico State Corp. Comm'n*, 101 N.M. 470, 684 P.2d 1135 (1984). The proper standard of review of administrative decisions is substantial evidence on the whole record, first enunciated in *Duke City Lumber Co.* and more recently reaffirmed in *National Council on Compensation Insurance v. Corporation Commission*, 107 N.M. 278, 756 P.2d 558 (1988). It is not our task to reweigh the evidence presented. *Duke City Lumber Co.*, 101 N.M. at 294, 681 P.2d at 720. The decision of the Council will be upheld if there is sufficient relevant evidence that a reasonable mind would accept as adequate to support a conclusion. *Baca v. Employment Servs. Div. of Human Servs. Dep't*, 98 N.M. 617, 651 P.2d 1261 (1982).

■ Whole record review does, however, contemplate a canvas by the reviewing court of all the evidence bearing on a finding or decision, favorable and unfavorable, in order to determine if there is substantial evidence to support the result. *Tallman v. ABF (Arkansas Best Freight)*, 108 N.M. 124, 767 P.2d 363 (Ct.App.1988). The reviewing court must find evidence that is credible in light of the whole record and that is sufficient for a reasonable mind to accept as adequate to support the conclusion reached, in the light of contravening evidence. *Id.* The district court in this appeal was required to apply the whole record review standard and, under *Groendyke Transport, Inc.*, we do also.

In applying the whole record standard announced in *Duke City* to the record before us, we take this opportunity to note that this standard of review has been the subject of much discussion and has caused a considerable amount of confusion. At-

tempts have been made, not only by this court, but by notable legal scholars and the legal profession as a whole, to clarify the proper use of the standard. *See, e.g., Tallman v. ABF (Arkansas Best Freight); Trujillo v. Employment Sec. Dep't,* 105 N.M. 467, 734 P.2d 245 (Ct.App.1987); Browde, *Substantial Evidence Reconsidered: The Post–Duke City Difficulties and Some Suggestions for Their Resolution,* 18 N.M.L.Rev. 525 (1988); Kelly & Gilmore, *Administrative Law,* 19 N.M.L.Rev. 575, 616–19 (concluding that *Trujillo* held that a reviewing court could make an independent finding if the agency finding was unsupported by substantial evidence and that the whole record review was in conflict with review "in the light most favorable to the agency," *id.* at 617).

Professor Browde's article suggests that the "second-tier [judicial] review should serve as a means of insuring that the first court has done its job in reviewing the agency," rather than as a review of the agency's fact finding for a second time. Browde, *supra,* at 557. He proposes application of the same focus used by the United States Supreme Court in reviewing the federal courts of appeal, which is whether they have "misapprehended the standard, or grossly misapplied it." *Id.; cf. Rowley v. Murray,* 106 N.M. 676, 748 P.2d 973 (Ct.App.1987) (deferential second-tier standard of judicial review applied where appellate court merely looked at whether the district court had applied the correct standard of review). We observe that, under the *Groendyke Transport, Inc.* approach, which requires the reviewing court to apply the same standard as that used by the district court in reviewing an agency's decision, an appellant in effect gets the benefit of a de novo appellate review at each judicial level, which not even a defendant convicted of a capital offense receives. Nonetheless, we are bound by supreme court precedent and follow *Groendyke Transport, Inc.* until it is changed.

Whatever else may be written on the subject, we have nonetheless undertaken to review the entire record as mandated by *Duke City* and its progeny. This review consisted of viewing the whole record in the light most favorable to the Council's decision, yet being at liberty to look at other convincing evidence. Having done so, we hold that there was substantial evidence on the whole record to support the Council's rezoning decision.

"No proposition of zoning law is better settled than that a municipality has the right to amend its zoning ordinance where the amendment is reasonable and follows the procedure prescribed by the enabling legislation." 2 E. Yokley, *Zoning Law and Practice* § 11–3, at 93 (4th ed. 1978). Protestors' claim that the Council's rezoning of the sixty-eight-acre parcel constituted illegal spot zoning is essentially founded on the argument that Bernalillo lacked a comprehensive plan as required by *Board of County Comm'rs v. City of Las Vegas,* 95 N.M. 387, 622 P.2d 695 (1980). We consider this specific contention and protestors' reliance on *City of Las Vegas* to be unwarranted, for reasons to be discussed later in this opinion. At this juncture, however, we shall first briefly discuss the development of the law in connection with spot zoning generally, then apply that law to the facts of this case.

The issue of whether spot zoning is per se illegal, or illegal only under certain circumstances, is an issue of first impression in New Mexico. Authority exists to support each position. *See* 2 E. Yokley, *supra,* § 13–3; 101A C.J.S. *Zoning* § 44 (1979). In *City of Albuquerque v. Paradise Hills Special Zoning District Commission,* 99 N.M. 630, 661 P.2d 1329 (1983), our supreme court adopted the language of *Corpus Juris Secundum* to define spot zoning:

> Spot zoning is an attempt to wrench a single lot from its environment and give it a new rating that disturbs the tenor of the neighborhood, and which affects only the use of a particular piece of property or a small group of adjoining properties and is not related to the general plan for the community as a whole, but is primarily for the private interest of the owner of the property so zoned.

*Id.* at 632, 661 P.2d at 1331 (footnotes omitted) (quoting 101A C.J.S. *Zoning* § 44).

■ We do not read *Paradise Hills* as necessarily adopting a rule making spot zoning per se impermissible. Nevertheless, we find it unnecessary to resolve that question in the case before us. We assume, without deciding, that protestors are correct that spot zoning is in all instances illegal and address their arguments under that assumption. Spot zoning is determined on an ad hoc basis, depending on the facts and circumstances of each case. 2 E. Yokley, *supra*, § 13–2.

> The term "spot zoning" refers to the rezoning of a small parcel of land to permit a use [that] fails to comply with a comprehensive plan or is inconsistent with the surrounding area, grants a discriminatory benefit to the parcel owner, and/or harms neighboring properties or the community welfare.

2 E. Ziegler, *supra*, § 28.01 at 28–1 to –2 (footnotes omitted) (citing to *City of Albuquerque v. Paradise Hills Special Zoning Dist. Comm'n,* as well as thirty-six other states and the District of Columbia, which use a similar definition). This definition indicates that spot zoning may occur under two circumstances: (1) if the use fails to comply with the comprehensive plan; or (2) if the use is inconsistent with the surrounding area, grants a discriminatory benefit to the land owner, and/or harms neighboring properties or the community welfare.

We discuss the second part of this definition first. There are many elements that make up the analysis, such as size of the land in question, character of the surrounding areas and the highest use for which a piece of property may be used, and whether the primary benefit goes to the lot owners or is also felt by the community as a whole. *Id.,* § 13–5 at 242 (citing *Clawson v. Harborcreek Township Zoning Hearing Bd.,* 9 Pa.Commw. 124, 304 A.2d 184 (1973)); *cf.* 1 N. Williams & J. Taylor, *American Land Planning Law* §§ 27.03 –.05 (Rev.1988) [hereinafter "N. Williams"] (suggesting that there are three factors of spot zoning: disharmony with the surrounding area, the size of the area rezoned, and a third subjective factor, the intent of the rezoning). We will address each of these considerations separately.

■ The subject land in this appeal is nearly sixty-eight acres. "[T]he fact that a tract is relatively large has been cited in several instances as indicating that no question of spot zoning is involved." 1 N. Williams, *supra*, § 27.04, at 740; *see* 2 E. Ziegler, *Rathkopf's The Law of Zoning and Planning* § 28.04(1)(a) n. 5 (Rev.1990) (citing a note published in 1959 reporting that "a study of 1255 cases found that the largest area reclassified that was subsequently held invalid was 13 acres"). The relatively large size of the tract in this case leans in favor of a finding against spot zoning.

The area surrounding the plot is largely vacant or in agricultural use. Although the property was previously zoned for agricultural and residential use, based on the facts adduced at the hearing, it is difficult to conclude that the best use of the subject acreage is for the originally zoned purposes. "A rezoning is more apt to be upheld if it can be shown that the tract was unsuitable for the uses allowed under the prior classification." 2 E. Ziegler, *supra*, § 28.04, at 28–18 n. 19 (citing *City of Pharr v. Tippitt,* 616 S.W.2d 173 (Tex. 1981)). The area is not prime residential property. It is bordered to the west and east by the railroad tracks and the highway. The nearest residential neighbors are one-quarter of a mile to the west. Some commercial uses coexist with the adjacent residential uses.

In *Mallory v. Town of West Hartford,* 138 Conn. 497, 86 A.2d 668 (1952) (cited in 2 E. Yokley, *supra*, § 11–3, at 94 n. 15), the court, in reviewing a town council's decision approving a change from residential to commercial zoning, held that the council had not acted arbitrarily and there was no abuse of discretion. *Mallory's* holding was based on the court's findings that the use of the area for business development was the highest use to which the land could be put, the land was not adapted to residential use on a sound economical basis, and no depreciation of neighboring residential property values would result. *See Keller v. City of Council Bluffs,* 246 Iowa 202, 66

N.W.2d 113 (1954) (zoning ordinance not violated where a reasonable exception is based upon the character and use of the property not similar to other property in the district); *Walker v. Town of Elkin*, 254 N.C. 85, 118 S.E.2d 1 (1961) (court held that due to the terrain and the location of the property rezoned and because there were no houses nearby, a 3.56–acre tract was not suitable for residential development). We believe the facts in this appeal reasonably indicate that this "industrial corridor" was best suited for industrial rather than residential use.

> In many instances the establishment of a district or zone by way of amendment might appear to be out of harmony with the comprehensive community plan, but the courts will uphold the change where it does no violence to the comprehensive plan as expressed in the general zoning ordinance but, on the contrary, harmonizes with an orderly growth of a new use for property in the respective locality.

2 E. Yokley, *supra*, § 13–1, at 204. We cannot say that, on the whole record, substantial evidence did not support the Council's redesignation of the subject area for light industry.

Our third consideration is whether the rezoning was primarily for the benefit of the property being annexed or whether it was done for the benefit of the community.

> The interests of the general community and the immediate neighborhood do not always coincide. In such a case, the community-wide need for commercial or industrial facilities usually takes precedence over objections by adjacent property owners * * * * The issue also arises whether the public benefit derived from rezoning to allow private industrial growth, with its accompanying tax revenue and employment opportunities, is sufficient to overcome the hardship often suffered by adjacent properties.

2 E. Ziegler, *supra*, § 28.03, at 28–10 to –11 (footnotes omitted). This is an *ad hoc* determination, based on the facts in each "spot zoning" challenge. "Courts sustain [small parcel rezoning to permit industrial use in order to stimulate industrial growth

in a community] if the public receives important benefits in the form of higher tax revenue, an enhanced industrial base, and/or employment opportunities." *Id.*, § 28.04 at 28–20 (footnotes omitted).

Here, there was considerable evidence presented to the Council that, when in operation, the Centex plant could employ as many as eighty-seven people from the community. The tax revenues would comprise nearly 25% of Bernalillo's annual budget. Additionally, as a condition for the granting of the rezoning request, Centex agreed to initiate a scholarship program and summer employment for the students at the local high school, as well as purchase land to develop and maintain a park. These factors, together with those we previously noted, lead us to conclude that there was substantial evidence to support a finding that the rezoning at issue was not spot zoning as defined in *Paradise Hills*.

■ We now return our discussion to protestors' reliance on *City of Las Vegas*. " ' "[S]pot zoning" is the very antithesis of planned zoning. If, therefore, an ordinance is enacted in accordance with a comprehensive zoning plan, it is not "spot zoning." ' " 1 N. Williams, *supra*, § 27.01 at 736 (quoting *Jones v. Zoning Bd. of Adjustment*, 32 N.J.Super. 397, 404, 108 A.2d 498, 502 (App.Div.1954)). *See also* 2 E. Ziegler, *supra*, § 28.02 at 28–4 to –5. NMSA 1978, Section 3–21–5 (Repl.1985) requires the regulations and restrictions of the municipal zoning authority to be in accordance with a comprehensive plan. *Board of County Comm'rs v. City of Las Vegas*. Under *City of Las Vegas*, the issue now narrows itself to the question of whether the rezoning of the subject land complied with the comprehensive plan of Bernalillo. For the reasons that follow, we conclude that it did.

■ We hold that the comprehensive plan need not be contained in one document. Rather, it may be comprised of several or no documents. In *City of Las Vegas*, our supreme court noted:

> We are mindful that a comprehensive plan may be found within the ordinance itself where the zoning authority has not

enacted a prior comprehensive plan * * * and that absence of a formally adopted comprehensive plan does substantially weaken the presumption of regularity of any zoning ordinance enacted without it. 95 N.M. at 390–91, 622 P.2d at 698–99. Protestors claim that Bernalillo's comprehensive plan consists only of the Bernalillo Development Statement (development statement) and that the rezoning at issue has not complied with that document. Protestors did not preserve this specific issue in their docketing statement. Nevertheless, we address it, since it will assist us in resolving the broader question of whether the disputed rezoning was indeed spot zoning for not having complied with the comprehensive plan.

■ Unlike the scenario in *City of Las Vegas*, where the county had not formally adopted a comprehensive plan, the district court here concluded, and we agree, that Bernalillo had adopted an extensive comprehensive plan, comprised not only of the development statement, but also of the Comprehensive Zoning Ordinance and the Greater Bernalillo Extraterritorial Zoning Authority Comprehensive Plan–Development Policy (Extraterritorial Development Policy).

*City of Las Vegas* noted the requirements for a master or comprehensive plan.

[A] master design for the physical development of the territory of the city * * * * [A] plan of the division of the land between public and private uses, specifying the general location and extent of new public improvements, grounds and structures * * * and, in the case of private developments, the general distribution among various classes of uses, such as residential business and industrial uses. The plan should be designed for a considerable period in the future, twenty-five to fifty years. It should be based, therefore, upon a comprehensive and detailed survey of things as they are at the time of planning, such as the existing distribution of existing developments, * * * the trends toward redistribution and growth * * * *

95 N.M. at 390, 622 P.2d at 698 (quoting 3 R. Anderson, *American Law of Zoning 2d* § 21.03 (1977) (quoting Kent, *The Urban General Plan*, at 30 (1964), with approval)).

The development statement, however, is not the rigid, unalterable plan that protestors would urge upon us. Rather, the language of the development statement's Conceptual Use Plan anticipated that it was "not to be received as a specific, unalterable plan, but rather as suggested general guidelines through which specific planning decisions can be made, such as zoning." It was further described as a working document subject to modifications and change as planning activity proceeded and more detailed information became available. The development statement also provided that "it is left for the Zoning Ordinance and its Zoning Map to render the Conceptual Land Use Plan more specific according to community desires and market conditions *as they are perceived at a given time."* (emphasis added). The development statement's introduction stated that, in its initial stages, the statement would be incomplete, but it would be continually updated and added to as the planning process continued.

Additionally, as evidence that the development statement was not intended to be the sole document comprising the comprehensive plan, the document itself specifically referred to the drafting of the Comprehensive Zoning Ordinance by the zoning commission. Finally, the statement mentioned the three-mile extraterritorial area later covered under the Extraterritorial Development Policy as within the scope of its future planning activities. This section of the development statement recognized the statutorily-created extraterritorial commission and its future project: the drafting of an ordinance for the three-mile extraterritorial area of the municipality.

Having determined that there was substantial evidence to support the district court's conclusion that the three documents comprised Bernalillo's comprehensive plan, we now direct our discussion to the question of whether the rezoning at issue was in accordance with the plan. Protestors

argue that the comprehensive plan, as embodied in the development statement, did not provide for industrial development at the proposed site of the Centex plant, and that, consequently, the rezoning constituted spot zoning. As support for this proposition, they refer us to the language and maps of the development statement showing industrial areas only to the south and east of Bernalillo. Protestors conclude that this fact "unequivocally" signifies that industrial development was not permitted in the annexed area. For the reasons that follow, we consider this argument as unsupported by the language or intent of the comprehensive plan.

The development statement noted that Bernalillo functions as a "dormitory community," signifying that over half of its working people must commute to other cities to work. It also provided that "a prominent consideration for the future is the provision of more locally available employment opportunities and a widening of the economic base of the community * * * * Further industrial development will be necessary for future growth." The development statement expressly stated that "the land north and west of Bernalillo provides unlimited expansion potential." It also provided:

> Continued efforts by the community to bring basic industries and businesses that expand the local economy and provide local employment opportunities [are] essential to Bernalillo's future growth. Since the Town acreage requirements reflect over 99% of the presently incorporated acreage, it appears certain that development pressure will call for annexation of additional land in the next few years. Since the area immediately to the east of the Town Limits is already heavily developed, further subdivision activity will shift to the north and west.

Section 3 of the Extraterritorial Development Policy stated that limited commercial and industrial development should be allowed in the "I–25 development corridor," which was defined as all lands lying within 800 feet of I–25. One of the goals explicitly stated in the development statement was to attract "clean industry." In short, the language of the comprehensive plan, as encompassed in the development statement, the Comprehensive Zoning Ordinance, and the Extraterritorial Development Policy, illustrated the community's interest in expanding the economic and industrial base and did not limit itself to development solely to the east and west of the town limits. The development statement also stated that "[t]he need for an expanded tax base and more development control make it advisable that some expansion of the corporate limits be accomplished in the very near future."

■ Finally, protestors take issue with the district court's finding that the Centex plant is "light industry" and that its manufacturing activities are allowed under special use zoning. Protestors argue that the gypsum wallboard plant is "heavy industry" and consequently violates the comprehensive plan. The Comprehensive Zoning Ordinance does not allow heavy industry, but provides for a light industrial zone. This zoning permits light manufacturing uses that do not endanger the health and safety of the community and that do not create offensive noise, vibration, smoke, and similar nuisances. Section 14 of the ordinance describes the special use zone as "permit[ting] only those uses [that] require special consideration because of their unusual nature, frequency of occurrence, effect on surrounding property or other similar reason." Section 14 then lists several special uses allowed under the special use zoning. As protestors correctly point out, and the council acknowledges, a gypsum wallboard manufacturing plant is not listed in the special uses. The district court found that the Centex plant constituted light industry and that the property on which it was located could have been zoned under the light industry zone provided in the Comprehensive Zoning Ordinance.

A determination of what constitutes "heavy" or "light" industry depends on the facts of each case. *See* 6 E. Yokley, *supra*, § 35–38. The Council heard testimony concerning the environmental effects of the plant's operation. Although protestors ar-

gue that the gypsum and fiberglass particulates attendant to the manufacturing process could be dangerous to the health of the community, Centex presented evidence that such risks of danger were low. Under these facts, the Council could properly have found that the Centex plant did not meet the definition of "heavy industry." Centex also offered testimony that the plant's state-of-the-art design would virtually eliminate all of the dust and that the plant's emissions would be far below the standards imposed by the state environmental regulatory agencies. Even protestors themselves acknowledged that only steam, not smoke, would be emitted from the plant's stacks.

Additionally, Centex was required to provide a buffer zone that would help eliminate traffic and loading noise. There was evidence that the sounds from the plant would not add appreciably to the sounds already caused by the interstate traffic and the railroad. Considering the entire record, we find substantial evidence supports the findings of fact. Finally, the Council conditioned the rezoning on the satisfaction of fourteen conditions intended to minimize the plant's negative effects. In reviewing the record, we note that most, if not all, of these conditions either have been complied with or are being completed. We conclude there was substantial evidence that the wallboard plant would not disturb the tenor of the surrounding area and that its manufacturing activities were permitted under special use zoning. We hold that, given the evidence presented before the Council, there was substantial evidence on the whole record to support its decision to approve Centex's application for special use zoning.

## CONCLUSION

We have considered the countervailing evidence; however, we hold that substantial evidence on the whole record supports the district court's affirmance of the Council's rezoning action. We conclude that the Council's action, in permitting the rezoning of the subject parcel for the construction and operation of Centex's manufacturing plant, did not constitute spot zoning. We conclude further that the Council's rezoning did not violate the provisions of Bernalillo's comprehensive plan. We therefore affirm the district court.

IT IS SO ORDERED.

BIVINS and CHAVEZ, JJ., concur.