Frank S. GRISWOLD, Appellant,

v.

CITY OF HOMER, Appellee.

No. S–6532.

Supreme Court of Alaska.

Oct. 25, 1996.

Frank S. Griswold, Homer, pro se.

Gordon J. Tans, Perkins Coie, Anchorage, for Appellee.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

EASTAUGH, Justice.

## I. INTRODUCTION

In 1992 the Homer City Council adopted Ordinance 92–18 amending Homer's zoning and planning code to allow motor vehicle sales and services on thirteen lots in Homer's Central Business District. Frank Griswold claims Ordinance 92–18 is invalid because it constitutes spot zoning. We affirm the superior court's rejection of that claim. Griswold also claims the Ordinance is invalid because a council member with a personal interest improperly participated in its adoption. We hold that the council member should not have participated. We consequently remand so the superior court can determine whether

that participation invalidates the Ordinance. Finally, we hold that Griswold is a public interest litigant who cannot be assessed the City's attorney's fees and court costs.

## II. FACTS AND PROCEEDINGS

Alaska Statute 29.40.020 requires that each first class borough establish a planning commission which will prepare, submit, and implement a comprehensive plan.[1] This plan must be adopted before the local government can adopt a zoning ordinance. AS 29.40.020–.040. A borough assembly "[i]n accordance with a comprehensive plan adopted under AS 29.40.030 and in order to implement the plan ... shall adopt or amend provisions governing the use and occupancy of land." AS 29.40.040. That statute requires the borough to implement the comprehensive plan by adopting provisions governing land use, including zoning regulations. Id. A borough may delegate this responsibility and the planning power to a city within the borough, if the city consents. AS 29.40.010(b). The Kenai Peninsula Borough delegated to the City of Homer the zoning authority for areas within the City.

The City adopted a comprehensive land use plan in 1983 and revised it in 1989. The City Council enacted zoning ordinances to implement the plans. Motor vehicle sales and services were not a permissible use within the Central Business District (CBD). Several businesses provided automobile services in the CBD before the City adopted the zoning ordinances. Those businesses were "grandfathered" into the zoning district and allowed to continue to provide those services as nonconforming uses, so long as those uses did not extend beyond the original lot boundaries and the property owners did not discontinue their nonconforming uses for more than one year.

---

1. AS 29.40.030 defines a comprehensive plan as follows:

[A] compilation of policy statements, goals, standards, and maps for guiding the physical, social, and economic development, both private and public, of the first or second class borough, and may include, but is not limited to, the following:

(1) statements of policies, goals, and standards;
(2) a land use plan;
(3) a community facilities plan;
(4) a transportation plan; and
(5) recommendations for implementation of the comprehensive plan.

Guy Rosi Sr. owns a parcel (Lot 13) in the CBD.[2] Rosi Sr. has continuously operated an automobile repair service on Lot 13. His repair business remains a valid nonconforming use in the CBD. Rosi Sr. also operated an automobile dealership on Lot 13 until sometime prior to 1990, but lost the right to continue that nonconforming use on that lot by discontinuing the vehicle sales business for more than one year.

Guy Rosi Jr. owns Lot 12, which is adjacent to his father's lot. Lot 12 is also in the CBD; because it had never been used for automobile sales or services, these uses were not grandfathered for Lot 12.

In 1986 the City received complaints that Lot 12 was being used for vehicle sales in violation of the zoning ordinance. In May 1986 Rosi Jr. applied to the Homer Advisory Planning Commission for a conditional use permit for Lot 12. The commission denied the application. It found that public services and facilities were adequate to serve the proposed use. The commission also found that automobile sales were not consistent with the purpose of the CBD; were not in harmony with the Comprehensive Plan; would negatively impact neighborhood character; but might not negatively impact the value of adjoining property more than permitted uses.

Rosi Jr. then applied for a contract rezone under Homer City Code (HCC) 21.63.020(c). The City granted the application in 1986, rezoning Rosi Jr.'s lot to General Commercial 1(GC1) and restricting its use to vehicle sales. Griswold does not challenge the Lot 12 contract rezone in this litigation.

Rosi Sr.'s Lot 13 was not affected by the Lot 12 contract rezone. In September 1990 Rosi Sr. requested that the CBD be rezoned to allow vehicle sales and related services. In August 1991 Rosi Sr., stating that he had not received any response to his earlier request, asked that Lot 13 be rezoned to allow vehicle sales and related services. During this period, there were numerous zoning proposals and public hearings regarding automobile-related services in the CBD, but some people spoke in favor of rezoning the area.

In January 1992 a commission memorandum informed the City Manager that the commission had been wrestling with several possible amendments to the zoning code since 1990, and that "[c]entral to the issue is the Commission's desire to rezone the Guy Rosi property to allow for vehicle sales." The commission noted that a proposed ordinance would allow automobile-related services in the CBD only on Main Street from Pioneer Avenue to the Homer Bypass, excluding corner lots with frontage on Pioneer Avenue and the Homer Bypass Road. However, the commission staff recommended that the council pass an ordinance which would allow automobile-related services "everywhere in the Central Business District or nowhere." The memo stated that the City Attorney felt the proposed ordinance would be difficult to enforce and defend.

In April the City Council adopted Ordinance 92–18, which amended HCC 21.48.020 by adding the following section:

> hh. Automobile and vehicle repair, vehicle maintenance, public garage, and motor vehicle sales, showrooms and sales lots, but only on Main Street from Pioneer Avenue to the Homer Bypass Road, excluding corner lots with frontage on Pioneer Avenue or the Homer Bypass Road, be allowed as a permitted use.

The Ordinance passed five-to-zero. One council member was absent. Brian Sweiven was one of the council members voting for the amendment. He owned one of the thirteen lots on which automobile sales and services were to be allowed under Ordinance 92–18. Sweiven both lived on his lot and operated an appliance repair business there. In 1994, stating he had a potential conflict of interest, he refrained from voting on Ordinance 94–13, which would have repealed subsection (hh). A week later he reversed that position and voted not to repeal subsection (hh).

■ Frank Griswold, the plaintiff in this case, owns an automobile repair shop in the CBD. Its operation was grandfathered in

---

**2.** Although the Borough's tax assessment records indicate that Guy Rosi Sr. owns only part of Lot

13, the parties and the trial court have referred to his parcel as "Lot 13." We do the same.

under the zoning code. He also lives in the CBD. Griswold's lot was not one of the thirteen lots directly affected by Ordinance 92–18. Griswold brought suit against the City, alleging under several theories that Ordinance 92–18 is an invalid exercise of the City's zoning power and that Sweiven's participation in the adoption of Ordinance 92–18 invalidates the Ordinance. Following a bench trial, the superior court found against Griswold on all issues. It later ordered him to pay a portion of the City's court costs and attorney's fees. Griswold appeals.

## III. DISCUSSION

 We have repeatedly held that it is the role of elected representatives rather than the courts to decide whether a particular statute or ordinance is a wise one.[3] *Norene v. Municipality of Anchorage*, 704 P.2d 199, 202 (Alaska 1985); *Seward Chapel, Inc. v. City of Seward*, 655 P.2d 1293, 1299 (Alaska 1982). In *Concerned Citizens of S. Kenai Peninsula v. Kenai Peninsula Borough*, 527 P.2d 447, 452 (Alaska 1974), we stated:

> A court's inquiry into arbitrariness begins with the presumption that the action of the legislature is proper. The party claiming a denial of substantive due process has the burden of demonstrating that no rational basis for the challenged legislation exists. This burden is a heavy one, for if any conceivable legitimate public policy for the enactment is apparent on its face or is offered by those defending the enactment, the opponents of the measure must disprove the factual basis for such a justification.

(Footnote omitted.) *See also* 6 Eugene McQuillan, *Municipal Corporations* § 20.05, at 12 (3d ed. 1988) ("The validity of an ordinance will be upheld where there is room for a difference of opinion 'even though the correctness of the legislative judgment is doubtful.' ") (quoting *Western Springs v. Bernhagen*, 326 Ill. 100, 156 N.E. 753, 754 (1927)).

 However, we will invalidate zoning decisions which are the result of prejudice, arbitrary decision-making, or improper motives. *See South Anchorage Concerned Coalition v. Coffey*, 862 P.2d 168, 174 (Alaska 1993) ("In reviewing zoning decisions, courts generally try to guard against prejudice, arbitrary decision-making, and improper motives.") (citing 3 Edward H. Ziegler Jr., *Rathkoph's The Law of Zoning and Planning* § 41.06, at 41–29, § 41.14(3)(b), at 41–93 (1992)). Similarly, a legislative body's zoning decision violates substantive due process if it has no reasonable relationship to a legitimate government purpose. *Concerned Citizens of S. Kenai Peninsula*, 527 P.2d at 452. Moreover, another court has noted, "The dividing line between ... mere difference in opinion and what is arbitrary is the line between zoning based on objective factual evidence and zoning without a rational basis." *Smith v. County of Washington*, 241 Or. 380, 406 P.2d 545, 548 (1965) (citations omitted).[4] In this case, Griswold argues that the City's Ordinance does not have a legitimate basis but rather is arbitrary spot zoning.[5]

We have not previously had the opportunity to consider whether a municipality's plan-

---

**3.** This appeal concerns the validity of an enactment of a legislative body, rather than a decision of a zoning board. *See Concerned Citizens of S. Kenai Peninsula v. Kenai Peninsula Borough*, 527 P.2d 447, 452 (Alaska 1974) (analyzing a Borough Assembly's ordinance as a legislative enactment). We are here reviewing a superior court judgment rejecting claims that a municipal ordinance is invalid. We give independent consideration to the legal conclusions of the superior court. *Beesley v. Van Doren*, 873 P.2d 1280, 1281 (Alaska 1994). We will uphold the superior court's findings of fact unless they are clearly erroneous. *In re R.K.*, 851 P.2d 62, 66 (Alaska 1993).

**4.** We have held that, although a planning commission is not required to make specific findings

supporting its decisions, it must articulate reasons for its decisions sufficient to assist the parties preparing for review and to restrain agencies within the bounds of their jurisdiction. *South Anchorage Concerned Coalition v. Coffey*, 862 P.2d 168, 175 (Alaska 1993) (citing *City of Nome v. Catholic Bishop of N. Alaska*, 707 P.2d 870, 875 (Alaska 1985); and *Kenai Peninsula Borough v. Ryherd*, 628 P.2d 557, 562 (Alaska 1981)).

**5.** Griswold also argues that the Ordinance is invalid because it is inconsistent with the City's zoning code and comprehensive plan. We consider this argument in conjunction with our discussion of spot zoning.

ning and zoning enactment is invalid because it constitutes "spot zoning." The City states that "this is not a case of 'spot zoning' at all" because the area in question remains zoned CBD. However, treatise discussions of spot zoning appear to make no distinction between cases where a zoning district has been reclassified and those where a new use without district reclassification is at issue. *See, e.g.,* 1 Robert M. Anderson *American Law of Zoning 3d* § 5.12, at 358 (1986) ("The common [spot zoning] situation is one in which an amendment is initiated at the request of an owner or owners who seek to establish a use prohibited by the existing regulations."). *See also, Ballenger v. Door County,* 131 Wis.2d 422, 388 N.W.2d 624, 627 (App.1986) (applying spot zoning analysis in a case where the zoning district remained the same but the permitted uses within the district were expanded); *Concerned Citizens of S. Kenai Peninsula,* 527 P.2d at 452 (whether zoning decision violates substantive due process depends on whether it has a reasonable relationship to a legitimate public purpose).

### A. Claim of Spot Zoning

 The "classic" definition of spot zoning is "the process of singling out a small parcel of land for a use classification totally different from that of the surrounding area, for the benefit of the owner of such property and to the detriment of other owners...." Anderson, *supra,* § 5.12, at 359 (quoting *Jones v. Zoning Bd. of Adjustment of Long Beach,* 32 N.J.Super. 397, 108 A.2d 498 (1954)). Spot zoning "is the very antithesis of planned zoning." *Id.*[6] Courts have developed numerous variations of this definition. *Id.* These variations have but minor differences and describe any zoning amendment

which "reclassifies a small parcel in a manner inconsistent with existing zoning patterns, for the benefit of the owner and to the detriment of the community, or without any substantial public purpose." Anderson, *supra,* § 5.12, at 362. Professor Ziegler states:

> Faced with an allegation of spot zoning, courts determine first whether the rezoning is compatible with the comprehensive plan or, where no plan exists, with surrounding uses. Courts then examine the degree of public benefit gained and the characteristics of land, including parcel size and other factors indicating that any reclassification should have embraced a larger area containing the subject parcel rather than that parcel alone. No one particular characteristic associated with spot zoning, except a failure to comply with at least the spirit of a comprehensive plan, is necessarily fatal to the amendment. Spot zoning analysis depends primarily on the facts and circumstances of the particular case. Therefore the criteria are flexible and provide guidelines for judicial balancing of interests.

3 Edward H. Ziegler Jr., *Rathkoph's The Law of Zoning and Planning* § 28.01, at 28–3 (4th ed.1995).

 In accord with the guidance offered by Professor Ziegler, in determining whether Ordinance 92–18 constitutes spot zoning, we will consider (1) the consistency of the amendment with the comprehensive plan; (2) the benefits and detriments of the amendment to the owners, adjacent landowners, and community; and (3) the size of the area "rezoned."

Edward H. Ziegler Jr., *Rathkoph's The Law of Zoning and Planning* § 28.01 n. 2 (4th ed.1995) (compiling cases holding same); Anderson, *supra,* § 5.12, at 359 n. 46 (same).

Thus, spot zoning is simply the legal term of art for a zoning decision which affects a small parcel of land and which is found to be an arbitrary exercise of legislative power. *Cf. Concerned Citizens of S. Kenai Peninsula,* 527 P.2d at 452 ("[T]he constitutional guarantee of substantive due process assures only that a legislative body's decision is not arbitrary but instead based upon some rational policy.").

---

**6.** The City argues that spot zoning should not be considered per se illegal, but merely descriptive. Thus, whether spot zoning is valid or invalid would depend upon the facts of each case. *See Chrismon v. Guilford County,* 322 N.C. 611, 370 S.E.2d 579, 588 (1988); *Save Our Rural Env't v. Snohomish County,* 99 Wash.2d 363, 662 P.2d 816 (1983); *Tennison v. Shomette,* 38 Md.App. 1, 379 A.2d 187 (1977). However, we will follow the vast majority of jurisdictions which hold that, while not all small-parcel zoning is illegal, spot zoning is per se illegal. *See Chrismon,* 370 S.E.2d at 588 (noting that majority of jurisdictions regard spot zoning as a legal term of art); 3

### 1. Consistency with the comprehensive plan

 Just as an ordinance which complies with a comprehensive plan may still constitute an arbitrary exercise of a city's zoning power, *Watson v. Town Council of Bernalillo,* 111 N.M. 374, 805 P.2d 641, 645 (App.1991), nonconformance with a comprehensive plan does not necessarily render a zoning action illegal. Anderson, *supra,* § 5.06, at 339–40. However, consistency with a comprehensive plan is one indication that the zoning action in question has a rational basis and is not an arbitrary exercise of the City's zoning power.

Homer's comprehensive plan divides the city into several zoning areas. By its own terms, Homer's comprehensive plan is not intended to set specific land use standards and boundaries; specific standards and boundaries are instead implemented through the City's zoning ordinance. The plan states, "The City shall encourage a mix of business/commercial and public/governmental activities in areas zoned or planned as central business district." The plan states that the CBD is "intended primarily for retail sales and services occurring within enclosed structures." The plan's objectives for the CBD are (1) to guide growth and development to provide a centrally located business and commercial area and focal point for the community; (2) to encourage infilling of the area already designated CBD before expanding the area; (3) to promote a safe, attractive, and easily accessible business and commercial core for pedestrian and vehicular visitors and residents; (4) to attract and accommodate a variety of uses to fill the business and commercial needs of downtown Homer; and (5) to tie into state and federal programs that beautify the business and commercial core.

Griswold does not dispute that the CBD is intended to allow commercial uses. He notes however, that although auto-related services are explicitly permitted in the General Commercial 1 District under HCC 21.49.020(d), the planning commission previously denied a conditional use permit for auto-related services on Main Street, specifically finding, *inter alia,* that automobile sales were not consistent with the purpose of the CBD and were not in harmony with the comprehensive plan. He also notes that the comprehensive plan provides that the CBD was meant primarily for retail sales and services occurring within enclosed structures. Further, the fact that the City began phasing out auto-related services in the CBD when it adopted the comprehensive plan, while simultaneously specifically permitting these services in the General Commercial I District, indicates to Griswold that auto-related sales and services were, at least at one time, considered incompatible with the CBD.

The superior court concluded that the Ordinance was consistent with the comprehensive plan. In so concluding, it considered the policy statement implementing the Ordinance, and found that the Ordinance "encourages private investment and infilling" and "enhances convenient access to other parts of the CBD which are designated for other uses." It noted that Policy 4.1 provided: "The City shall research the nature of land uses and CBD land use needs and evaluate the need for subzones in the CBD."

Griswold points to trial evidence that the expansion of auto-related services in the CBD does not further all the goals of the comprehensive plan, but he fails to demonstrate that the superior court's finding—that the Ordinance is consistent with the plan—is clearly erroneous. Although the evidence presented by Griswold would *permit* a finding that the City Council had believed in 1986 that auto-related uses were incompatible with the CBD and the zoning ordinance as it then read, that evidence does not *compel* a finding that auto-related uses are in fact incompatible with the CBD or comprehensive plan, or that the City Council's 1992 change of opinion is unsupportable and arbitrary.

The superior court did not clearly err in making the findings discussed above. The court permissibly relied on Policy 4.1, which anticipates the type of action at issue here. The comprehensive plan does not expressly prohibit automobile sales or service establishments in the CBD. As the City notes, motor vehicle sales are most appropriately classified as a business and commercial use, for which the CBD was intended under the plan.

Homer's city planner testified at trial that the Ordinance is in accordance with Homer's comprehensive plan. We conclude that the superior court did not err in holding that Ordinance 92–18 is consistent with the City's comprehensive plan.

### 2. Effect of small-parcel zoning on owner and community

Perhaps the most important factor in determining whether a small-parcel zoning amendment will be upheld is whether the amendment provides a benefit to the public, rather than primarily a benefit to a private owner. *See* Anderson, *supra,* §§ 5.13–5.14; Ziegler, *supra,* § 28.03, § 28.04, at 28–19 (calling an amendment intended only to benefit the owner of the rezoned tract the "classic case" of spot zoning). Courts generally do not assume that a zoning amendment is primarily for the benefit of a landowner merely because the amendment was adopted at the request of the landowner. Anderson, *supra,* § 5.13, at 368. If the owner's benefit is merely incidental to the general community's benefit, the amendment will be upheld. Ziegler, *supra,* § 28.04, at 28–19 to 28–20. The City argues that Ordinance 92–18 serves the interests of the general community rather than primarily the interests of the Rosis. We agree.

### a. Benefits and detriments to the community

Griswold argues that there are many negative aspects of the City's decision to allow auto-related uses in the CBD. Griswold presented evidence that the neighborhood character would be harmed by the zoning amendment. He presented evidence that a newspaper article quoted Planning Commissioner Cushing as saying that public opinion was overwhelmingly against allowing auto-related services in the CBD and that many Homer citizens expressed the opinion that

their homes and businesses would be harmed by introducing auto-related services into the area. A real estate agent testified that property in the CBD has a higher value than property in the GC1 District.

Many jurisdictions, including this one, have held that interests such as the preservation of neighborhood character, traffic safety, and aesthetics are legitimate concerns. *Barber v. Municipality of Anchorage,* 776 P.2d 1035, 1037 (Alaska) (holding the government's interest in aesthetics is substantial and should be accorded respect), *cert. denied,* 493 U.S. 922, 110 S.Ct. 287, 107 L.Ed.2d 267 (1989); *Cadoux v. Planning and Zoning Comm'n of Weston,* 162 Conn. 425, 294 A.2d 582, 584 (holding increased traffic a valid reason to deny application for rezone), *cert. denied,* 408 U.S. 924, 92 S.Ct. 2496, 33 L.Ed.2d 335 (1972). Contrary to the implication of the City's argument,[7] these are tangible harms. Moreover, the City itself appears to be concerned about the effects of auto-related services on property values and aesthetics, as evidenced by the council's findings supporting its confinement of the zoning change to Main Street,[8] and the commission's earlier finding that use for automobile sales would negatively impact neighborhood character.

 However, despite this negative aspect of Ordinance 92–18, it appears that the Ordinance will result in genuine benefits for the City of Homer. The City notes that before adopting Ordinance 92–18, for a year and a half it deliberated proposals which would allow auto-related uses in the CBD and delineated the many benefits which it believed the Ordinance will confer upon the community. These benefits include encouraging filling in vacant places in the CBD; increasing the tax base and employment in the CBD; increasing convenience and accessibility for local and regional customers for vehicle repairs or purchases; and promoting orderly growth and development in the

---

**7.** The City argues that Griswold could not show any "concrete detriment" but instead "could only argue that car lots were not pleasant to look at, they didn't alleviate traffic, and other similar arguments."

**8.** At trial the City's planner testified that the Ordinance was restricted to Main Street to avoid

certain negative impacts in more tourist-oriented areas. These negative impacts include traffic congestion, visual blight, detraction from the pleasing aesthetic nature of Pioneer Avenue, and conflict with the comprehensive plan's goal of promoting sidewalks, pocket parks, and pedestrian amenities in the CBD.

CBD.[9] Homer's city planner testified that the Ordinance provides a convenience to the public and guides growth and development to a centrally located area, while restricting such uses to areas away from tourists or to areas for visitors and pedestrians.

The superior court stated that Ordinance 92–18 advances legitimate legislative goals articulated in HCC 21.28.020 including but not limited to regulating and limiting the density of populations; conserving and stabilizing the value of properties; providing adequate open spaces for light and air; preventing undue concentration of population; lessening congestion on streets and highways; and promoting health, safety and general welfare. The court found "as a matter of fact and law that Ordinance No. 92–18 bears a substantial relationship between legitimate legislative goals and the means chosen to achieve those goals."

Griswold has demonstrated that there are some negative aspects of allowing auto-related uses in the CBD. Nonetheless, giving proper deference to the City Council as legislative policymaker and to the superior court as finder of fact, we cannot conclude that these detriments so outweigh the benefits of Ordinance 92–18 that we must hold the Ordinance was arbitrarily and capriciously adopted.

### b. Benefit to the landowner

 It appears that initially the City was primarily concerned with Rosi Sr.'s interests.[10] Rosi Sr. initiated the inquiry into rezoning the CBD. Before the City amended the zoning code, the planning commission chair stated that "[c]entral to the issue is the Commission's desire to rezone the Guy Rosi property to allow for vehicle sales." In 1991 commissioners "voiced their dislike for spot zoning but felt it important to right a wrong [done to Mr. Rosi]." The City planning staff stated that " 'spot zoning' is not good planning; however there are extenuating circumstances that support the proposed change in zone." The commission supported these con-

9. Not all of the goals articulated by the City can be considered legitimate per se. For example, any zoning change which eases restrictions on property use could be said to further the goal of "filling in vacant places." Similarly, increasing the tax base and the employment of a community is not automatically a legitimate zoning goal. See Concerned Citizens for McHenry, Inc. v. City of McHenry, 76 Ill.App.3d 798, 32 Ill.Dec. 563, 568, 395 N.E.2d 944, 950 (1979) (an increase in the tax base of the community as the primary justification for a rezone is "totally violative of all the basic principles of zoning"); Oakwood at Madison, Inc. v. Township of Madison, 117 N.J.Super. 11, 283 A.2d 353, 357 (1971) (finding that "fiscal zoning per se is irrelevant to the statutory purposes of zoning [although] 'alleviating tax burden is a permissible zoning purpose if done reasonably and in furtherance of a comprehensive plan) (citing Gruber v. Mayor and Tp. Committee of Raritan Tp., 39 N.J. 1, 186 A.2d 489, 493 (1962))' "; Chrobuck v. Snohomish County, 78 Wash.2d 858, 480 P.2d 489, 497 (1971) (allowing industrial development on only one site would be arbitrary spot zoning despite the potential tax revenue the oil refinery would produce). Thus, the goal of increasing the tax base and employment opportunities is usually legitimate only if the ordinance is otherwise reasonable and in accordance with the comprehensive plan.

Some courts have allowed inconsistent small or single parcel rezoning in order to raise tax revenues or stimulate needed industry if the public receives higher tax revenue or employment industries. Ziegler, supra, § 28.04, at 28–20. Generally, the facility being built must be indisputably needed, and the city must have secured assurance as to the existence and amount of increased employment and tax revenue. For example, in Information Please Inc. v. County Comm'rs of Morgan County, 42 Colo.App. 392, 600 P.2d 86 (1979), the county rezoned agricultural area to industrial to accommodate an electric utility after determining the plant would add $46,000,000 to the tax base of the county, and provide approximately 250 jobs after it was completed. Id. 600 P.2d at 88. In Watson v. Town Council of Bernalillo, 111 N.M. 374, 805 P.2d 641, 647 (App.1991), the county made findings that the rezone would employ eighty-seven people from the community and would produce tax revenues constituting twenty-five percent of the city's budget. In Chrismon v. Guilford County, 322 N.C. 611, 370 S.E.2d 579, 590 (1988), the court approved the rezoning of two contiguous tracts from agricultural to conditional use industrial district to facilitate expansion of an already-operating grain elevator. The court stated that the "[e]vidence clearly shows that [the owner's] operation is beneficial to area farmers." Id. It also noted that spot zoning will be allowed even where the adjacent property owners object and the owner receives a greater benefit than others if there is a community-wide need for the rezone. Id.

10. Currently, Rosi Jr.'s lot is not affected by Ordinance 92–18 since that lot has been contract rezoned to GC1.

clusions with the following findings of fact: (1) the property owner had owned and operated a business on the property since the early 1950's; (2) public testimony and response to staff were positive; (3) the City Attorney's response was positive; and (4) the business was an expensive business to establish and maintain. This desire to accommodate the needs of a businessman who had been in the community for decades is understandable. Nevertheless, small-parcel zoning designed merely to benefit one owner constitutes unwarranted discrimination and arbitrary decision-making, unless the ordinance amendment is designed to achieve the statutory objectives of the City's own zoning scheme, even where the purpose of the change is to bring a nonconforming use into conformance or allow it to expand. *See Speakman v. Mayor of N. Plainfield*, 8 N.J. 250, 84 A.2d 715, 718–19 (1951). Otherwise, the City would be forced either to discriminate arbitrarily among landowners seeking relaxed restrictions or to abandon the concept of planned zoning altogether. Thus, if assisting Guy Rosi Sr. was the primary purpose of the Ordinance, we would invalidate it even if it was not the product of discriminatory animus.

However, it appears that the City Council was ultimately motivated to pass the Ordinance because of the community benefits the council perceived rather than because of the benefit the Ordinance would confer upon Rosi Sr. The Ordinance restricted auto-related uses to one street not because its real intent was to benefit Rosi Sr.'s property, but, as Homer's city planner testified, because the City desired to minimize the negative impact of auto-related uses, especially the impact of such uses on more pedestrian and tourist-oriented areas such as Pioneer Avenue. *See also supra* note 7. Similarly, it appears that vacant lots located farther from Pioneer Avenue were excluded not because Rosi did not own these lots, but in an attempt to prevent urban sprawl by filling in vacant places in developed areas before expanding develop-

ment. These reasons are legitimate, nondiscriminatory justifications for enacting the Ordinance.

### 3. *Size of "rezoned" area*

Ordinance 92–18 directly affects 7.29 acres.[11] The size of the area reclassified has been called "more significant [than all other factors] in determining the presence of spot zoning." Anderson, *supra*, § 5.15, at 378. The rationale for that statement is that "[i]t is inherently difficult to relate a reclassification of a single lot to the comprehensive plan; it is less troublesome to demonstrate that a change which affects a larger area is in accordance with a plan to control development for the benefit of all." *Id.* at 379.

We believe that the relationship between the size of reclassification and a finding of spot zoning is properly seen as symptomatic rather than causal, and thus that the size of the area rezoned should not be considered more significant than other factors in determining whether spot zoning has occurred. A parcel cannot be too large per se to preclude a finding of spot zoning, nor can it be so small that it mandates a finding of spot zoning. Although Anderson notes that reclassifications of parcels under three acres are nearly always found invalid, while reclassifications of parcels over thirteen acres are nearly always found valid, *id.*, as Ziegler notes, the *relative* size of the parcel is invariably considered by courts. Ziegler, *supra*, § 28.04, at 28–14. One court found spot zoning where the reclassified parcel was 635 acres in an affected area of 7,680 acres. *Chrobuck v. Snohomish County*, 78 Wash.2d 858, 480 P.2d 489, 497 (1971).

Nor does the reclassification of more than one parcel negate the possibility of finding spot zoning. Ziegler, *supra*, § 28.04, at 28–15. In this case, there was some evidence that the reclassified area may have been expanded to avoid a charge of spot zoning. Other courts have invalidated zoning amendments after finding that a multiple-parcel

---

**11.** There may be an immaterial discrepancy about the size of the reclassified area. There was testimony Ordinance 92–18 affected 7.29 acres, but the trial court's memorandum decision stated the affected lots contained about 7.44 acres.

That decision did not state that the exact size of the parcel was significant to its determination that the amendment does not constitute illegal spot zoning.

reclassification was a subterfuge to obscure the actual purpose of special treatment for a particular landowner. *Id. See Atherton v. Selectmen of Bourne,* 337 Mass. 250, 149 N.E.2d 232, 235 (1958) (holding that the amendment is "no less 'spot zoning' by the inclusion of the additional six lots than it would be without them" where proponents of a zoning change apparently anticipated a charge of spot zoning and enlarged the area to include the three lots on either side of the lot in question).

Homer's CBD is over 400 acres; the reclassified area is 7.29 acres. The CBD appears to contain approximately 500 lots; the reclassified area contains 13 lots. A comparison of the size of the area rezoned and the size of the entire CBD is not in itself sufficient to persuade us that the City's decision was the product of prejudice, arbitrary decision-making, or improper motives. *South Anchorage Concerned Coalition v. Coffey,* 862 P.2d 168, 174 (Alaska 1993).

Further, it is not necessarily appropriate to compare the area of the affected lots with that of the entire CBD. The comprehensive plan recognized the possibility of subzones. The City considered significant portions of the CBD to be inappropriate for automobile sales and services, particularly Pioneer Avenue and the Bypass. Subtracting those areas from the entire CBD, the reclassified area on Main Street is a relatively larger part of the remaining CBD.

Thus, having considered the relative size of the rezoned area in determining whether Ordinance 92–18 constituted spot zoning, we hold that the size of the area rezoned does not require a finding of spot zoning given other factors supporting a contrary conclusion. We conclude that the superior court did not err in finding that Ordinance 92–18 does not constitute spot zoning.

**B. *Claim of Conflict of Interest***

■ Homer City Council member Brian Sweiven owned one of the thirteen lots in the

reclassified area. He was one of nine owners directly affected by Ordinance 92–18. It appears that it was Sweiven who first recommended to the commission that the rezone apply only to Main Street. An article in the Homer News was titled "Sweiven proposes commercial zoning for downtown Homer." The article refers to the idea of rezoning Main Street as "Sweiven's proposal." Griswold alleges that Sweiven had a disqualifying conflict of interest under Homer municipal law and that his participation in the adoption of Ordinance 92–18 therefore invalidates the Ordinance, even though Sweiven's vote was not necessary for passage. The superior court found that Sweiven did not have a disqualifying conflict of interest and that even if he had, his participation in the deliberations and vote would not invalidate Ordinance 92–18.

1. *Was there a conflict of interest?*

■ Homer City Code 1.24.040(g) states:

A member of the Council shall declare a substantial financial interest the member has in an official action and ask to be excused from a vote on the matter. The Mayor or other presiding officer shall rule on the request; however, the decision may be overridden by the majority vote of the Council. Should a Council member fail to declare a substantial financial interest, the Council may move to disqualify that member from voting by a majority vote of the body. A Council member with a conflict of interest regardless of whether excused from voting, shall not be allowed to participate in discussion about the matter.[12]

The code defines "substantial financial interest" as

1. An interest that will result in immediate financial gain; or
2. An interest that will result in financial gain which will occur in the reasonably foreseeable future.

---

12. In addition, Homer's City Code mandates that a city official "disclose *any* financial interest in any matter before the board or commission *before* debating or voting upon the matter" and prohibits the official from participating in the debate or vote unless the board or commission determines that a financial interest is not substantial as defined in HCC 1.12.010. HCC 1.12.070 (emphasis added).

HCC 1.12.010(a). Under common law, "the focus ... [is] on the relationship between the public official's financial interest and the possible result of the official's action, regardless of the official's intent." *Carney v. State, Bd. of Fisheries,* 785 P.2d 544, 548 (Alaska 1990) (citing *Marsh v. Town of Hanover,* 113 N.H. 667, 313 A.2d 411, 414–15 (1973)).[13] The plain language of HCC 1.24.040(g) appears to coincide with this principle.

The City Council did not address Sweiven's alleged conflict of interest until after the Ordinance had been passed. After the council passed the Ordinance, the City Attorney advised the council to address the matter at its next meeting by having Sweiven declare the facts concerning his ownership of the land and ask the council to determine whether his participation in the matter constituted a conflict of interest under the City Code, and to have the Mayor then rule on this question. The City Attorney stated that if the City were to determine that Sweiven had a disqualifying conflict of interest, it should declare the Ordinance void. The City Attorney also stated that, in his opinion, Sweiven's ownership did not constitute a disqualifying conflict of interest.

The superior court found that

> [t]here has been no showing that passage of the ordinance will result in a financial gain to Council member Sweiven, now or in the future. In fact, it may act as a detriment. Council member Sweiven's interest in Ordinance No. 92–18 is simply too remote and/or speculative to require his disqualification as a legislative official.

This finding is clearly erroneous. The court further stated,

> Plaintiff correctly surmises that Council Member Sweiven's purpose and intent at the time he promoted and voted for the ordinance are of crucial importance in determining whether or not he had a conflict of interest.

This holding incorrectly states the law, because the proper focus is on the relationship between the official's financial interest and the result of the official's action, "regardless of the official's intent." *Carney,* 785 P.2d at 548.

Sweiven had a "substantial financial interest" within the meaning of HCC 1.12.010(a)(2) in a reclassification which would increase the permissible uses of his property. Indeed, it seems inconsistent for the City to argue both that the Ordinance will benefit the City by increasing the tax base and property values, and that it will not benefit Sweiven's lot in a similar fashion.

The City nevertheless asserts that Sweiven's interest in the passage of Ordinance 92–18 is too remote and speculative to constitute a disqualifying interest, and argues that Sweiven's property is affected the same way as other citizens' property. The City attempts to distinguish *Carney* in which we held that fishermen who sat on the Board of Fisheries could vote on matters affecting the fishing industry as a whole but were disqualified from voting on regulations which affected the area in which they actively fished. We reasoned in *Carney* that the members should have abstained from decision-making in areas in which they had a narrow and specific interest. *Id.* at 548. The City argues that Sweiven did not have a narrow and specific interest because "Mr. Sweiven's operations (his home and appliance repair business) are not affected at all by Ordinance 92–18 (automobile sales and services)."

Ordinance 92–18 does not directly affect all of Homer, or even a large part of the City or an entire class of its citizens. Sweiven voted on an amendment which directly affects only thirteen lots, including his own, out of the 500–some lots in the CBD. According to the Alaska Department of Law, the common law requires that a legislator refrain from voting on a bill which will inure to the legislator's financial benefit if the legislator's interest "is peculiarly personal, such as when a bill bene-

---

**13.** At first glance it may appear that the Executive Branch Ethics Act, AS 39.52.010–.960, which explicitly supersedes the common law on conflicts of interest, *see* AS 39.52.910, requires intent on the part of public officials subject to that Act. *See* AS 39.52.120(b)(4). However, that Act does not apply to municipal officials. *Gates v. City of Tenakee Springs,* 822 P.2d 455, 462 (Alaska 1992). Thus, the common law of conflicts of interest continues to apply to municipal officers. *Carney,* 785 P.2d at 547–48.

fits only a tiny class of which the legislator is a member." 1982 Formal Op. Att'y Gen. 4133.

Furthermore, it is said in the context of zoning:

> Most of the cases [of disqualifying conflict of interest] have involved a charge of a more-or-less direct financial interest, and it is clear that such an interest is a proper ground of disqualification, as where the officer himself holds property which is directly involved in or affected by the proceeding.
>
> . . . .
>
> The clearest situation in which disqualifying bias or prejudice is shown is that where the zoning officer himself owns property the value of which will be directly promoted or reduced by the decision to be made and it is not surprising that upon a showing of such interest the courts have usually held the officer disqualified.

W.E. Shipley, Annotation, *Disqualification for Bias or Interest of Administrative Officer Sitting in Zoning Proceeding*, 10 A.L.R.3d 694, 697 (1966). Sweiven himself apparently believed that the Ordinance would increase the value of his property. In recommending the limited rezone to the planning commission, he stated that "it would increase the tax base and property values" of the area. The record reflects that when Sweiven was advocating rezoning the entire CBD, he was quoted in the Homer News as stating: "Even my own business. I can't sell my business, but I can sell my building, and someone who wants to put a VW repair shop there—he can't. . . . It's not just me. This gives everybody in town a lot more options as far as selling their business." Finally, Sweiven initially refrained from voting on Ordinance 94–13, which would have repealed Ordinance 92–18, on the ground that he had a potential conflict of interest. It consequently appears that Sweiven had a "substantial financial interest" as that term is defined in HCC 1.12.010(a).

The superior court's finding that Sweiven did not have a disqualifying conflict of interest is clearly erroneous.

2. *What was the effect of the conflict of interest?*

There are six voting members on the Homer City Council. Five voted for Ordinance 92–18 on its first reading. One was absent. Four weeks later, it passed its second and final reading, again by a vote of five in favor and one absent. Thus, without counting Sweiven's vote, Ordinance 92–18 would have passed. The superior court held that even if Sweiven had a disqualifying conflict of interest, his participation and voting would not invalidate the result. In support it cited *Waikiki Resort Hotel v. City of Honolulu,* 63 Haw. 222, 624 P.2d 1353, 1370–71 (1981).

*Waikiki* followed the rule, also articulated in several other jurisdictions, that where the required majority exists without the vote of the disqualified member, the member's participation in deliberation and voting will not invalidate the result. 624 P.2d at 1371 (citing *Singewald v. Minneapolis Gas Co.,* 274 Minn. 556, 142 N.W.2d 739 (1966); *Anderson v. City of Parsons,* 209 Kan. 337, 496 P.2d 1333 (1972); *Eways v. Reading Parking Auth.,* 385 Pa. 592, 124 A.2d 92 (1956)). The *Waikiki* court also cited *Marshall v. Ellwood City Borough,* 189 Pa. 348, 41 A. 994 (1899), where the court reasoned that because the other four members voted in favor of the disputed ordinance, the invalid vote of one city councilman had no legal efficacy; thus, the court would not invalidate the ordinance. *Waikiki,* 624 P.2d at 1371.

*Waikiki* cited decisions from three other jurisdictions holding that a vote cast by a disqualified member vitiates the decision in which the member participated, even if the vote does not change the outcome of the decision. 624 P.2d at 1370 (citing *Piggott v. Borough of Hopewell,* 22 N.J.Super. 106, 91 A.2d 667 (1952); *Baker v. Marley,* 8 N.Y.2d 365, 208 N.Y.S.2d 449, 170 N.E.2d 900 (1960); *Buell v. City of Bremerton,* 80 Wash.2d 518, 495 P.2d 1358 (1972)). In *Buell,* the court stated:

> The self-interest of one member of the planning commission infects the action of the other members of the commission regardless of their disinterestedness. The recommendation of the planning commission to the city council could not be as-

sumed to be without impact on the council. More importantly, it would not appear to the affected public that it was without impact, and [the disqualified member's] actual financial gain is sufficient to invalidate the entire proceeding.

495 P.2d at 1362–63 (citations omitted).

These lines of authorities offer a choice between vote-counting (*Waikiki*) and automatic invalidation (*Buell*). We have not had occasion to consider this exact issue. In *Carney*, we found that four of seven fisheries board members had a disqualifying conflict. We then held the board's regulation invalid: "Because a majority of the votes cast to pass the regulation are invalid, so is the regulation." 785 P.2d at 549. *Carney* did not raise the issue now before us because there the measure would have been invalidated under either doctrine.

▪ We decline to follow the vote-counting approach adopted in *Waikiki*, notwithstanding its appealing ease of application. A council member's role in the adoption or rejection of an ordinance cannot necessarily be measured solely by that member's vote. A conflicted member's participation in discussion and debate culminating in the final vote may influence the votes of the member's colleagues. Moreover, the integrity required of public officeholders demands that the appearance of impropriety be avoided; the approach adopted in *Waikiki* will not always do so. *See Falcon v. Alaska Pub. Offices Comm'n*, 570 P.2d 469, 477 (Alaska 1977) (holding financial disclosure laws preserve the integrity and fairness of the political process both in fact and appearance); *Warwick v. State ex rel. Chance*, 548 P.2d 384, 388 (Alaska 1976) ("[I]t is important that the legislature not only avoid impropriety, but also the appearance of impropriety."). *Cf.* AS 39.50.010(b)(1) (public office is a public trust which should be free from the danger of conflict of interest). The superior court erred in holding that Ordinance 92–18 is

valid simply because Sweiven did not cast the decisive vote in its adoption.

We also decline, however, to adopt the rule of automatic invalidation endorsed in cases such as *Buell*, 495 P.2d at 1362–63. The vote and participation of a conflicted member will not invariably alter the votes of other members or affect the merits of the council's decision. This is especially true if the conflict is disclosed or well-known, allowing other members to assess the merits of the conflicted member's comments in light of his or her interest. Automatic invalidation could needlessly overturn well-considered measures which would have been adopted even if the disqualified member had refrained from participating. Automatic invalidation has the potential for thwarting legislative enactments which are not in fact the result of improper influence.

The dissenting opinion cites HCC 1.12.030 as justification for its conclusion that participation by a disqualified member requires invalidation of the council's action.[14]

HCC 1.12.030 and 1.24.040(g), however, determine whether a member may vote or participate. They deal with disqualification, and do not address the consequences of participation by a conflicted member. The drafters of the code must have contemplated that violations might occur notwithstanding the prohibition. They nonetheless specified no remedy. Had they intended that particular consequences would follow from violation of the prohibition, such as the clear-cut remedies of automatic invalidation or vote-counting, they could have easily so provided. Their failure to specify a remedy for violation implies that the drafters intended that the courts fashion the remedy.

▪ In determining whether the vote of a conflicted member demands invalidation of an ordinance, courts should keep in mind the two basic public policy interests served by

---

**14.** The portion of HCC 1.12.030 cited by the dissent states:

A City Councilmember or Mayor with a conflict of interest under section 1.12.020 shall so declare to the body as a whole and ask to be excused from voting on the matter. However, a City Councilmember or Mayor with a conflict

of interest, regardless of whether excused from voting, shall not be allowed to participate in discussion about the matter. (Ord.92–49(A) § 4, 1992; Ord. 86–22(S) § 1(part), 1986).

This language is nearly identical to the similar prohibition in HCC 1.24.040(g), but also applies to the mayor.

impartial decision-making: accuracy of decisions, and the avoidance of the appearance of impropriety. *See generally* Mark W. Cordes, *Policing Bias and Conflicts of Interest in Zoning Decisionmaking,* 65 N.D. L.Rev. 161 (1989).

 Guided by these basic policy concerns, we conclude that the following analysis should be applied in determining the effect of a conflicted vote. Initially the court must determine whether a member with a disqualifying interest cast the decisive vote. If so, the ordinance must be invalidated. *Carney,* 785 P.2d at 549. If the ordinance would have passed without the vote of the conflicted member, the court should examine the following three factors: (1) whether the member disclosed the interest or the other council members were fully aware of it; (2) the extent of the member's participation in the decision; and (3) the magnitude of the member's interest. The first two factors squarely bear on the accuracy of the council's decision. All three factors directly relate to any appearance of impropriety.

 If the interest is undisclosed, the ordinance will generally be invalid; it can stand only if the magnitude of the member's interest, and the extent of his or her participation, are minimal. If the interest is disclosed, the ordinance will be valid unless the member's interest and participation are so great as to create an intolerable appearance of impropriety. The party challenging the ordinance bears the burden of proving its invalidity. We recognize that this analysis is more difficult to apply than the vote-counting and automatic invalidation rules. Simple to apply, those rules are unacceptably rigid.

 The factual record before us is not so clear that we can decide as a matter of law whether invalidation is appropriate. The record does not reveal whether the other council members had actual knowledge of Sweiven's interest. While Sweiven's interest in his lot, where he lived and worked, was open and obvious, this is a matter of potential factual dispute to be explored on remand. Likewise, we cannot weigh the extent of Sweiven's participation or say whether it may have affected the outcome of the measure.

Nor does the record establish whether Sweiven was likely in the foreseeable future to realize any significant appreciation from the reclassification by selling or servicing motor vehicles or by selling his lot to someone who intended to do so. We therefore remand so that the superior court, applying the analysis discussed above, can determine whether Ordinance 92–18 must be invalidated.

### C. *Public Interest Litigant Status*

 The superior court found that Griswold was not a public interest litigant. That finding was clearly erroneous because Griswold met all four criteria of a public interest litigant in this case: (1) his lawsuit was designed to effectuate strong public policies; (2) if Griswold succeeded, numerous people would have benefited from the lawsuit; (3) only a private party could be expected to bring the action; and (4) Griswold lacked sufficient economic incentive to bring the lawsuit if it did not also involve issues of general importance. *See Oceanview Homeowners Ass'n, Inc. v. Quadrant Constr. and Eng'g,* 680 P.2d 793, 799 (Alaska 1984) (citing *Kenai Lumber Co. v. LeResche,* 646 P.2d 215, 222–23 (Alaska 1982)).

In *Oceanview,* the plaintiff was a homeowners' association which objected to a Zoning Board of Appeals decision to set aside orders issued by the Zoning Enforcement Office of the Anchorage Department of Public Works. These orders restricted improvements to and the use of a private airstrip located in a residential area. 680 P.2d at 795. We held that the homeowners' association was a public interest litigant. *Id.* at 799. We found that "Oceanview's appeal was designed to vindicate a strong public policy in effectuating zoning ordinances, that numerous people in the area would have benefited had it succeeded, and that only a private party could have been expected to bring the appeal." *Id.*

The superior court stated that "it is hard to see how declaring a valid legislative enactment 'illegal' would be of benefit to anyone." That statement misapprehends the meaning of the public interest litigant criteria and has no application here. Griswold's appeal was

designed to vindicate the strong public policy of ensuring that zoning ordinances are not arbitrary or capricious. This public policy is quite similar to, and at least as important as, ensuring that zoning ordinances are properly enforced. The importance of this issue to the general public is evidenced by the considerable amount of public comment regarding the passage of the Ordinance, prompting one planning commissioner to state, "[t]he car lot deal drew as much public comment as anything we (planners) have had but the sign ordinance." Likewise, just as the *Oceanview* suit benefited at least the community of homeowners, Griswold's suit was intended to benefit the entire community of Homer, especially those who live, shop, and operate small businesses in the CBD, by challenging the City's alleged arbitrary deviation from its zoning plan. It is also true in this case, as in *Oceanview*, that only private citizens can be expected to bring suit against a municipality for a zoning violation of this nature, not because the issue is not one of general importance, as the superior court stated, but because the defendant in this case is the public entity which would normally be enforcing Homer's zoning code.

Only the fourth component of the public interest litigant test appears even arguable. That criterion requires that the public interest litigant not have "sufficient economic incentive to bring the lawsuit even if it involved only narrow issues lacking general importance." Griswold lives in the CBD and owns an automobile repair shop on a lot located in the CBD but not included in the reclassified area. He thus continues to be restricted by his "grandfather" status in the operation of his business, and may lose his rights if he ceases operation for more than one year. The superior court agreed with Griswold that "any economic advantage he might have gained, if successful, was slight." The court nevertheless found that this fact "does not obviate the fact that one of [Griswold's] primary motives in pursuing this litigation was to achieve this goal." Thus, the court found that even a "slight" economic gain can be sufficient to constitute a plaintiff's primary motivation in bringing a lawsuit. Neither case law nor the record in this case supports the court's finding.

In *Oceanview* we found that the homeowners' association which claimed that the "immediate effect of the [adverse zoning board] decision is to deny or diminish the value of real property owned or leased by appellant" was nevertheless a public interest litigant, citing Oceanview's "consistent emphasis on health and safety to the virtual exclusion of economic concerns." 680 P.2d at 799 n. 3. Likewise, in this case, Griswold's emphasis was always on the harm to the community, the importance of public accountability, and fairness in municipal government. Griswold stated in a sworn affidavit that he did not have any expectation of financial gain as a result of filing the lawsuit. He wrote a letter to the Homer Advisory Planning Commission stating that he opposed rezoning any areas of the CBD to GC1. These facts are not contested. Moreover, it appears that Griswold only discussed the exclusion of his own lot to illustrate the equal protection problems and arbitrariness inherent to spot zoning cases, and to demonstrate his standing, disputed by the City early in the suit, to bring this lawsuit. *See id.* (stating that appellant's claim of standing due to immediate economic harm is "not synonymous with 'economic incentive' "). The court's emphasis on Griswold's "political motivation" also conflicts with its finding that the hope of slight economic gain was Griswold's primary motivation.

Griswold satisfies Alaska's four-factor public interest litigant test. We consequently hold that he is a public interest litigant.

## IV. *CONCLUSION*

We hold that Ordinance 92–18 does not constitute spot zoning, and consequently AFFIRM that aspect of the judgment below. We hold, however, that council member Sweiven had a conflict of interest which should have disqualified him from participating in consideration of the Ordinance. We consequently REVERSE the court's finding that there was no conflict of interest and REMAND so the superior court can determine whether the Ordinance must be invalidated. We also REVERSE that portion of

the judgment imposing costs and fees on Griswold.

RABINOWITZ, Justice, dissenting in part.

I believe it is of particular significance that Sweiven participated in the discussion of and voted for Ordinance 92–18. As the court observes, this ordinance does not directly affect all of Homer, or even a large segment of the City or an entire class of its citizens. More particularly, the ordinance directly affects only thirteen lots, including Sweiven's own, out of approximately 500 lots located within the Central Business District. The record further reveals Sweiven's belief that Ordinance 92–18 would increase the value of his property. Indeed Sweiven explicitly stated that "[the proposal] would increase the tax base and property values" of the area when recommending the Limited Rezone to the planning commission.[1]

Based on the foregoing, the court correctly concludes that "Sweiven had a 'substantial financial interest' within the meaning of HCC 1.12.010(a)[2] in a reclassification which would increase the permissible uses of his property.... The superior court's finding that Sweiven did not have a disqualifying conflict of interest is clearly erroneous." Op. at 25, 28.

My disagreement with the court's opinion goes to its discussion of the effect of Sweiven's conflict of interest and the appropriate

remedy given the factual context of this case. Central to my differing analysis are the provisions of the Homer City ordinances which address the subject of conflict of interest. In my view, the court's analysis ignores that part of the Homer Municipal Code 1.12.030, which states:

> A City Councilmember or Mayor with a conflict of interest under section 1.12.020 shall so declare to the body as a whole and ask to be excused from voting on the matter. However, a City Councilmember or Mayor with a conflict of interest, regardless of whether excused from voting, shall not be allowed to participate in discussion about the matter. (Ord.92–49(A) § 4, 1992; Ord. 86–22(S) § 1(part), 1986).[3]

The City of Homer, as expressed in section 1.12.030 of its Code, has adopted a policy which flatly contradicts the court's statement that

> [t]he vote and participation of a conflicted member will not invariably alter the votes of other members or affect the merits of the council's decision. This is especially true if the conflict is disclosed or well known, allowing other members to assess the merits of the conflicted member's comments in light of his or her interest.

Regardless of the wisdom of the City of Homer's legislative enactment barring con-

---

1. The court notes:

 The record reflects that when Sweiven was advocating rezoning the entire CBD, he was quoted in the Homer News as stating: "Even my own business. I can't sell my business, but I can sell my building, and someone who wants to put a VW repair shop there—he can't.... It's not just me. This gives everybody in town a lot more options as far as selling their business." Finally, Sweiven refrained from voting on Ordinance 94–13, which would have repealed Ordinance 92–18, on the ground that he had a potential conflict of interest.

 Op. at 27.

2. At all times relevant to the case at bar, HCC 1.12.010(a) defined "substantial financial interest" as follows:

 1. An interest that will result in immediate financial gain; or
 2. An interest that will result in financial gain which will occur in the reasonably foreseeable future.

(HCC 1.12.010 has subsequently been amended.) HCC 1.12.020 provides:
A City Councilmember or Mayor with a substantial financial interest in an official action to be taken by the Council has a conflict of interest. (Ord.92–49(A) § 3, 1992; Ord. 86–22(S) § 1(part), 1986).

3. HCC 1.12.040 provides:

 The Mayor or, in his absence, the Mayor Pro–Tem or other presiding officer, shall rule on a request by a City Councilmember to be excused from voting on a matter because of a declared conflict of interest. The Mayor Pro–tem or other presiding officer shall rule on a request by the Mayor to be excused from participating in a matter because of a declared conflict of interest. (Ord.92–49(A) § 5, 1992; Ord. 86–22(S) § 1(part), 1986).
 HCC 1.12.050 further provides:
 A decision of the Mayor or other presiding officer under Section 1.12.040 may be overridden by a majority vote of the City Council. (Ord.86–22(S) § 1(part), 1986).

flicted council members' participation in decisions,[4] the fact remains that the City of Homer has expressly adopted a rule specifically prohibiting conflicted council members from taking part in discussion or voting on the matter of interest. In fact, the prohibition on discussion is more stringent than the rule on voting—even when the "Mayor or other presiding officer" decides that the member need not be excused from voting, and even when the council chooses not to override that decision by a simple majority vote, the member is nonetheless forbidden to participate in the discussion.

The rule adopted by the court pays no heed to this participation ban contained in the City of Homer's municipal code. The portions of the court's rule which conflict with the express non-participation policy of HCC 1.12.030 are the following:

> If the interest is undisclosed, the ordinance will generally be invalid; *it can stand only if* the magnitude of the member's interest, and *the extent of his or her participation, are minimal.* If the interest is disclosed, the ordinance will be valid unless the *member's interest and participation are so great as to create an intolerable appearance of impropriety.*

(Emphasis added.) In short, the court's rule would permit a conflicted council member to participate in the discussion of a matter before the body responsible for official action in cases where the conflicting interest has been disclosed, or where the conflicting interest is undisclosed and the conflicted member's participation does not create an intolerable appearance of impropriety.

Although the court's formulation might well be adopted as a general rule, I think it inappropriate to do so in the face of an ordinance completely prohibiting participation by any city council member with a substantial conflicting interest in the subject matter of a proposed ordinance. In this regard, it is noteworthy that HCC 1.12.030 is not couched in terms of *de minimis* levels of participation. On the contrary, it imposes a complete ban on the conflicted member's participation.

Given the participation ban imposed by HCC 1.12.030, Sweiven's conflict generating significant financial interest, and Sweiven's participation in the discussion of Ordinance 92–18, I conclude that the appropriate remedy is invalidation of the ordinance.

As the court recognizes, a council member's role in the adoption or rejection of an ordinance cannot necessarily be measured solely by that member's vote. A conflicted member's participation in discussion and debate culminating in the final vote may influence the votes of the member's colleagues. The court also appropriately recognizes that the integrity required of public office holders demands that even the appearance of impropriety be avoided.[5]

---

**4.** This court has consistently held that it is not our function to question the wisdom of legislation. *University of Alaska v. Geistauts*, 666 P.2d 424, 428 (Alaska 1983); *Alaska Interstate v. Houston*, 586 P.2d 618, 621 (Alaska 1978).

**5.** *See generally* Mark W. Cordes, *Policing Bias and Conflict of Interest in Zoning Decisionmaking*, 65 N.D. L.Rev. 161 (1989). Here the author writes in part:

> The second and more common provision is to prohibit participation when a conflict of interest exists. The rationales behind this are obvious. Although disclosure has some restraining effect, a significant conflict might still affect the substantive outcome of a decision. More importantly, perceptions of fairness and legitimacy are only partly addressed by disclosure.
>
> For these reasons disqualification rather than disclosure is the preferable approach. Although in some instances disclosure might adequately address the need for impartiality, in many instances it will only be partially effective. The inconvenience of adjusting to the disqualification of a decisionmaker is not so great as to justify the threat to accuracy and legitimacy posed by the requirement of mere disclosure.
>
> Beyond determining what effect a conflict of interest should have on a particular decisionmaker is what judicial remedies should be available when a zoning decision in fact involved an improper conflict of interest. In those instances in which the biased decisionmaker casts a dispositive vote, courts have consistently invalidated the decision. This seems appropriate in that both accuracy and legitimacy concerns are clearly threatened when a decision appears to turn on the vote of a self-interested decisionmaker.
>
> A more difficult issue is whether the participation of a conflicting member whose vote was not determinative to a decision should also result in invalidation. This might occur in two general situations. First is where the

Guided by these principles and the City of Homer's explicit ban on a conflicted member's participation, I respectfully dissent from the court's remedy. Rather than remand this issue, I would hold Ordinance 92–18 invalid because of council member Sweiven's participation.[6]

tainted vote was numerically unnecessary for the decision. Courts have evenly split on this issue, with a slight majority favoring invalidation. Courts refusing to invalidate such decisions have primarily reasoned that even without the tainted vote the decision would have occurred anyway and therefore invalidation is improper. In this sense the threat to accuracy and legitimacy concerns is arguably de minimis when the particular vote is apparently not crucial to a decision. In particular, legitimacy concerns are less threatened when a decision appears inevitable. As a result, the administrative burden of invalidating and remanding a decision outweighs any threat to substantive results and perceptions of fairness.

Despite these distinctions, several strong reasons exist for invalidating decisions even when a tainted decisionmaker's vote was numerically unnecessary for the decision. First, courts invalidating such decisions have noted that collegial decisionmaking ideally involves the exchange of ideas and views, often with the intent of persuading toward a particular position. The actual contribution of any particular decisionmaker cannot be measured with precision, but frequently extends significantly beyond the actual vote cast. For this reason, a significant threat to accuracy can exist even when a particular vote was numerically unnecessary for the decision.

For similar reasons legitimacy concerns also exist even when a vote is numerically unnecessary. Although legitimacy concerns are less substantial in such circumstances, the perception of collegial decisionmaking and the potential influence of a tainted decisionmaker on others would violate "appearance of fairness" standards. Thus, for both accuracy and legitimacy reasons the better view is that even when a vote is numerically unnecessary for a decision courts should still invalidate it.

*Id.* at 214–216 (footnotes omitted).

6. I note my agreement with the court's other holdings.