SOUTH ANCHORAGE CONCERNED COALITION, INC., Deanna M. Essert, Don Martin McGee, Stephen Gervel and Kenneth Banzhof, Appellants,

v.

Dan COFFEY and G.F. Kalmbach, and Municipality of Anchorage, Appellees.

No. S–5197.

Supreme Court of Alaska.

Nov. 12, 1993.

Joyce E. Bamberger, Anchorage, for appellants.

Kenneth D. Jensen, Jensen, Harris & Roth, Anchorage, for appellees.

Before MOORE, C.J., and RABINOWITZ, BURKE and COMPTON, JJ.

## OPINION

BURKE, Justice.

The South Anchorage Concerned Coalition (SACC) appeals the superior court's reversal of the Anchorage Planning and Zoning Commission's (the Commission's) decision to deny a conditional use permit to Dan Coffey and G.F. Kalmbach (Coffey). The superior court ruled that the findings supporting the permit denial were legally deficient and were not supported by substantial evidence. The court ordered the Commission to grant the permit. We reverse.

## I. *FACTS & PROCEEDINGS*

The property involved in this appeal is a 58–acre parcel of land known as the Kalmbach gravel pit. The property was once operated as a commercial gravel pit but now lies idle. It is located near Kincaid Park in Anchorage and abuts the south side of Kincaid Road and the east side of Lucy Street. A sizable housing development currently exists on the east side of Lucy Street, but few other houses stand in close proximity to the property. The property is zoned R–2A SL, a classification designed primarily for noncommercial residential uses, but which also permits "natural resource extraction" as a conditional use. AMC 21.40.040(A), (D)(7).

Starting in August 1989, Coffey sought city approval for a three-phase, residential subdivision development plan for the property. The first phase of the plan called for the completion of "grading" which entailed the extraction and removal of 1.6 million cubic yards of marketable gravel from the property over a period of three to five years. The final project phases called for the completion of a residential subdivision conforming to R–2A zoning. It was the proposed gravel extraction of phase one which created the controversy giving rise to this appeal.

When Coffey's plan went to the Board of Adjustment[1] (Board) for final approval, the Board determined that the proposed gravel excavation was so extensive that a conditional use permit was required. In March 1990, Coffey applied to the Commission for a "natural resource extraction" conditional use permit. With the application, Coffey submitted an extensive "Conditional Use Narrative" which provided, among other things, a grading plan, a staging plan, a truck haul plan, and a "Materials Extraction/Restoration Study." The most significant features of the proposed operation follow.

The grading operation envisioned the removal of 1.6 million cubic yards of gravel material from the site for commercial sale. The gravel would be moved offsite in 80,000 truck trips over a three to five year period. Ten to twenty trucks would leave the site per hour from 7 a.m. to 6 p.m., Monday through Saturday, five months out of the year. Trucks would carry signs with the name of the subdivision development company and a phone number for the public to call if the trucks caused safety hazards or property damage. The truck drivers would be registered and proof of insurance would be documented. The trucks would enter and leave the site at Snead Street, the point on the property farthest away from existing homes.

Silts and fine sands, called overburden, would first have to be removed to access the marketable gravel. The overburden would then be compacted back into the

---

1. Under AMC 21.10.030, the Anchorage Assembly sits as the Board of Adjustment to hear appeals from decisions of the Platting Board and the Commission.

excavation pit to attain the final subdivision grades. Coffey's engineering geologist acknowledged that overburden is difficult to compact when wet and concluded that engineering control would be necessary to assure that structures built on the compacted overburden would not be subjected to unstable ground conditions. He nonetheless concluded that with proper engineering supervision, the pit in question could be regraded to permit a variety of future uses.[2]

Noise levels at the site would also occasionally exceed the standard limitation of noise levels for residential property set by the Municipality of Anchorage, but generally, activities would remain below acceptable noise levels. The gravel excavation would proceed to a maximum depth of 25 feet above mean sea level, taking it to within 10–15 feet of the area's water table.[3] The final grade and contours of the proposed subdivision would be fairly severe. Although the final contours would be an improvement over the existing contours, the subdivision would still be located in a depression with steep sloping sides (a two foot horizontal to one foot vertical rise) fifty feet high. According to the geologist's report, this 2:1 slope represented the maximum slope allowable for hillside stability.

The Commission planning staff reviewed the Coffey plan and recommended approval of the conditional use permit subject to thirty-three operating conditions previously imposed by the Platting Board and twenty-one additional conditions proposed by the Commission staff.[4] The staff apparently concluded that if the final plan satisfied the fifty-four conditions of approval, it would comply with municipal code standards.[5] See AMC 21.50.020 and 21.50.070(B) (providing standards for the issuance of a "natural resource extraction" conditional use permit).

On April 16, 1990, the Commission held a public hearing on the use permit. The Commission heard from its planning staff, Coffey and his representative, Mr. Sawhill, SACC representatives, and many Sand Lake residents who opposed the permit application.[6] The opposition's statements were primarily anecdotal accounts of past

2. The geologist's report acknowledged that standard Municipality specifications require that "backfill should be placed in maximum 12 inch lifts and compacted to 95% maximum density." However, the report concluded that this requirement was "unduly restrictive" and that 95% density would "be difficult or impossible to achieve due to the high natural moisture contents in the silty overburden."

3. This feature of the plan caused considerable concern among area residents about contamination of their well water supply. However, Coffey's geologist concluded that past pit operations had not adversely affected water quality.

4. Although Coffey attempts to bolster his argument by relying on the planning staff's "approval" of his plan, the transcript from the public hearing indicates that a planning staff recommendation of "approval with conditions" is not as significant as Coffey suggests. After one commissioner stated that the planning staff should not have recommended the plan, another commissioner explained that it was beneficial to the process for the staff to lay out all the conditions which could make the plan acceptable even if the overall plan was not satisfactory. The planning staff representative also stated that "99% of the time, we're going to give you conditions of approval."

5. Given the fact that the most controversial aspect of the Coffey plan was the removal and sale of large quantities of gravel, the planning staff recommendation surprisingly never clearly explained how, or even if, this feature of the plan conformed to the conditional use ordinances or the Sand Lake Redevelopment Plan. At one point, the recommendation states that the staff's original view was that material could not leave the site for regrading purposes. The recommendation never clearly explains why, or even if, this opinion has changed.

6. An overriding point of contention was the need to remove such a large quantity of gravel from the site. SACC personnel and Commissioners repeatedly argued that the property could reach the proposed final grade of the subdivision without extracting the marketable gravel below grade. They felt that the land could simply be held until market conditions made a straightforward subdivision development economically feasible or until more gravel pit owners came together with a "master plan" for redevelopment of the area. On the other hand, Coffey, through his representative Mr. Sawhill, maintained that the commercial gravel operation was essential to development of the subdivision because the profits from the gravel sales would fund the rest of the development.

negative experiences with the pits while they were operating or assertions from residents that they had relied on the Sand Lake Redevelopment Plan ("SLRP") when buying property and believed that further gravel extraction would not be permitted in the area. A few people giving statements had experience either in land use planning, construction, or real estate, but no one actually purported to provide "expert testimony."

The residents cited: (1) danger from gravel on the road and dust and noise from the excavation operation; (2) concern over water contamination if the excavation goes too deep and hits the water table; (3) the dangers posed by heavy gravel trucks on the road; (4) concern that the many permit conditions could not be effectively enforced; (5) concern that project guarantees would be insufficient to ensure that Coffey would go forward with residential development once the gravel extraction phase was complete; and (6) concern that the subdivision would not be marketable given the glut of available housing and its poor location in a former gravel pit.

At the end of the hearing, the commissioners voted unanimously to deny the permit for the following reasons: (1) the adverse impact of open pit mining on both the property values and the quality of life of the residential neighborhoods near the property;[7] (2) concern that the depth of the proposed excavation, particularly excavating "below grade," was inconsistent with the purpose and assumptions of the SLRP; (3) the Sand Lake pit operators' understanding that no new, large-scale commercial gravel operations would be allowed following adoption of the SLRP by the Commission; (4) the fact that fifty-four conditions were added to the plan indicated that it was an "inherently incompatible use" with the surrounding area; (5) the belief that the final contours of the subdivision were undesirable and potentially unstable; (6) the plan was not "redevelop-

ment" but was actually commercial mining contrary to the SLRP and R–2A zoning;[8] (7) the desirability of a "master plan" for redevelopment in which several gravel pit owners work together to design a subdivision with less extreme grading; and (8) the concern that gravel trucks leaving a residential area would pose a safety hazard. Only one commissioner expressly concluded that the plan actually satisfied the standards of AMC 21.50.020 and .070. However, she voted to deny the permit because she believed that the strong public sentiment against the project indicated that there was "something wrong with the project."

After the vote, the planning staff drew up Resolution No. 88–019A from the substance of the hearing minutes. The findings of fact parallel the commissioners' above-stated reasons for denying the permit. The resolution contained no separate conclusions of law section.

As provided for in AMC 21.30.010, Coffey appealed the permit denial to the Assembly sitting as the Board of Adjustment. The Board concluded that Resolution 88–019A did not provide sufficient findings to support the permit denial and remanded the case back to the Commission for further findings. The Board did not require the Commission to reopen the record or take additional testimony. The Board members did not suggest that the denial itself was improper, but they were concerned that the Commission's findings might be insufficient to allow for judicial review in an anticipated court challenge.

On remand, the Commission met to review proposed new findings and conclusions which the planning staff had prepared prior to the meeting. The commissioners reviewed the findings section-by-section, making amendments as necessary. They then adopted a new resolution which added a separate section for "conclusions

7. One commissioner stated: "Primarily, it comes down very simple for me. If I knew that ... I was buying into an area where open pit mining was going to be going on, I wouldn't buy a home there."

8. One commissioner stated that the "finished grades of the subdivision look to me like the finished grades of a gravel pit."

of law and fact." [9]  Among its findings, the resolution states that the subdivision "requires a massive commercial natural resource extraction" and notes that the plan fails to conform to the SLRP in various ways.  It further provides: "The interim use . . . will have negative impacts to the adjacent surrounding neighborhood, as well as traffic impacts to the surrounding neighborhood."  The "conclusions of law and fact" rely heavily on the policies and goals of the SLRP to justify denying the permit.

Coffey again appealed to the Board, but this time the Board affirmed the permit denial.  The Board recognized that the SLRP had not been adopted by the Assembly but concluded that it was valid as a Commission guide to future development of the Sand Lake Gravel pit area.  The Board noted that the commercial gravel industry and local residents made substantial investments based on the SLRP which contemplated the "projected closure of the Sand Lake area to gravel extraction." [10]  The Board concluded that the evidence and the Commission's findings adequately supported the permit denial.

■  Coffey appealed this decision to the superior court in April 1991.  Superior Court Judge Karl Johnstone reviewed the Commission's findings and the administrative record and reversed the permit denial.  He determined that the Commission and the Assembly had improperly relied on the SLRP as a standard and as evidence to support its findings.  He also held that the gravel extraction operation could not be considered a permanent negative impact to the area within the meaning of AMC 21.50.-020.  Judge Johnstone further concluded from his review of the record that the Commission had rejected Coffey's permit application based on "community sentiment rather than objective and proper criteria." [11]

Instead of remanding the case to the planning agency for further action, Judge

---

9.  The parties dispute whether both resolutions or only the second one forms the basis for the denial.  Coffey argues that because 88–019A was never formally rescinded, both documents are still in effect and should be considered the *ratio decidendi* of the Commission's decision.  Coffey's position actually hurts his case because the two findings together provide stronger support for the permit denial than the second resolution alone.  However, based on our reading on the transcript, it appears that the Commission intended only the second resolution to have continuing force.

10.  In fact, the SLRP does not contemplate the closure of the Sand Lake pits to all further gravel excavation.  However, as a general planning document, the SLRP does contemplate that all future extraction plans be of a limited duration and always with the primary goal of the residential development of the area.  In its conclusion, the SLRP also states that

strong consideration should be given to permitting such extraction *only* for use in filling unserviceable areas located in nearby pits. . . . [C]onsideration should [also] be given to filling in on-site unserviceable areas first prior to export.  Finally, in no case shall extraction extend below those contours established for a gravel-fed sewerage system.

The SLRP proposed that the gravel pit owners join together to work out a "master plan" for redevelopment of the area.  It did not endorse piecemeal development by individual pit owners.  The SLRP stated, "the primary goal is to establish a residential community in this area.  This has been determined to be in the public's best interest; therefore, future action should follow in this direction.  *Any plans that steer us farther from this goal should be put to rest.*"

11.  Although we agree with Judge Johnstone that a permit denial based on negative community sentiment alone is improper, we disagree with his reading of the record.  As noted above, only one commissioner expressly based her vote on "community sentiment."  The recognized rule is that a planning board may always take evidence and testimony from community members into account in making its permitting decisions, but that it may not rely on neighborhood opposition alone as a reason to deny a permit:

Zoning should not be allowed or disallowed on the basis of a plebiscite of the neighborhood, although evidence submitted by persons living in the neighborhood who would be most familiar with it and the conditions therein may be considered.

3 Edward Ziegler, *Rathkoph's The Law of Zoning and Planning* § 41.14 at 41–91 (1992); *see also Thurston v. Cache County*, 626 P.2d 440, 445 (Utah 1981) ("While it is true that the consent of neighboring landowners may not be made a criterion for the issuance or denial of a conditional use permit, there is no impropriety in the solicitation of, or reliance upon, information which may be furnished by other landowners in the vicinity of the subject property at a public hearing.") (footnotes omitted).

Johnstone simply directed the city to issue the permit. The city chose not to appeal this mandate and granted the conditional use permit subject to the fifty-four conditions which have been mentioned above. Judge Johnstone then stayed action on this permit pending the outcome of SACC's appeal to this court.

## II. STANDARD OF REVIEW

▪▪▪ Under AS 29.40.060 and AMC 21.-30.180(A) and .190, the superior court hears appeals from the Commission and Board of Adjustment denials of conditional use permits. The appeal "shall be heard solely on the record established before the municipal bodies" and the zoning body's decision "shall not be reversed if, in the light of the whole record, they are supported by substantial evidence." AMC 21.30.190; *see also Galt v. Stanton*, 591 P.2d 960, 965 (Alaska 1979) (Rabinowitz J., concurring); *Keiner v. City of Anchorage*, 378 P.2d 406, 411 (Alaska 1963). The majority rule, and the one we adopt, is that judicial review of zoning board decisions is narrow and that a presumption of validity is accorded those decisions.[12] *See* 3 Edward Ziegler, *Rathkoph's The Law of Zoning and Planning*, § 42.07 at 42–65 (1992). We will give no weight to the superior court's decision but will independently review the record because the superior court was acting as an intermediate appellate court with respect to the Commission's decision. *Cook Inlet Pipe Line Co. v. Alaska Pub. Util. Comm'n*, 836 P.2d 343, 348 (Alaska 1992).

**12.** The great weight of authority also suggests that zoning board interpretations of zoning ordinances and planning documents "should be given great weight and should be accepted whenever there is a reasonable basis for the meaning given by the board." Ziegler, *supra* note 11, § 42.07 at 42–65; *Seattle Shorelines Coalition v. Justen*, 93 Wash.2d 390, 609 P.2d 1371, 1373 (1980).

On the construction of zoning ordinances, we have previously held that the "appropriate standard of review is substitution of judgment." *Bocek Brothers v. Anchorage*, 750 P.2d 335, 336 (Alaska 1988). However, *Bocek* involved a condemnation proceeding rather than an administrative appeal of a planning agency decision. *Id.* Because the case did not require it, the

## III. DISCUSSION

### A. *The Commission correctly applied AMC 21.50.020 and 21.50.070 to deny the permit application.*

Anchorage Municipal Code 21.50.020 and 21.50.070(B) provide the standards for determining whether the Commission may issue a natural resource extraction conditional use permit.

The authority hearing a conditional use application may approve [13] the application only if it finds that the conditional use:

A. Furthers the goals and policies of the Comprehensive Development Plan and conforms to the Comprehensive Development Plan in the manner required by Chapter 21.05;

B. Conforms to the standards for that use in this title and regulations promulgated under this title;

C. Will be compatible with existing and planned uses in the surrounding neighborhood and with the intent of its use district; and

D. Will not have a permanent negative impact on the items listed below substantially greater than that anticipated from permitted development;

1. pedestrian and vehicular traffic circulation and safety;

2. the demand for and availability of public services and facilities;.

3. noise, air, water or other forms of environmental pollution;

superior court did not consider planning agency interpretations of the ordinance in question. Likewise, we did not consider whether zoning agency expertise came into play in interpreting the ordinance. When a planning agency does, in fact, provide its interpretation of an ordinance within its area of expertise, we will give that interpretation considerable deference.

**13.** By its plain language, the ordinance requires that the Commission deny permit applications if it finds that any standard is not met. However, *the use of the terms "may approve" indicates that the Commission also has discretion to deny the permit even if it finds that the standards are met.*

4. the maintenance of compatible and efficient development patterns and land use intensities.

AMC 21.50.020.

In addition to these requirements, "natural resource extraction" conditional use applications must also satisfy the procedural requirements of AMC 21.50.070(A) and meet the substantive standards of AMC 21.50.070(B). Subsection (B) requires that (1) access to the operation "minimize the use of residential streets" and that suitable dust and traffic controls be adopted; (2) "the extraction operations will not pose a hazard to the public health and safety;" (3) "the extraction operations will not generate noise, dust, surface water runoff or traffic that will unduly interface with surrounding land uses;" (4) "the restoration plan ... assures that after extraction operations cease, the site will be left in a safe, stable and aesthetically acceptable condition;" and (5) the use meets all additional standards imposed by regulation.

SACC argues that the evidence and the Commission's factual findings demonstrated that Coffey's proposed gravel extraction operation failed to meet at least one, if not several, of the substantive standards imposed by these ordinances. SACC further argues that the Commission properly referred to and relied on the SLRP in making its decision to deny the conditional use permit.

1. *The Status of the SLRP.*

The Commission denied Coffey's permit application based, in part, on the project's failure to conform to the planning goals of the SLRP. Coffey argued successfully to the superior court that reference to this document was improper because it essen-

tially added a new standard to the exclusive list provided by AMC 21.50.020 and .070. We disagree.

We see no reason why the Commission should not be allowed to consider the SLRP in ruling on the appropriateness of a proposed conditional use in the Sand Lake area. Although the Commission and the Board recognized that the SLRP did not have the status of a zoning ordinance, the SLRP is a detailed, thoroughly researched planning document which the Commission adopted by resolution and has repeatedly used to guide its decision-making in the Sand Lake area.[14]

In reviewing zoning decisions, courts generally try to guard against prejudice, arbitrary decision-making, and improper motives. *See* Ziegler, *supra* note 11, § 41.06 at 41–29 and § 41.14(3)(b) at 41–93. Reliance on comprehensive planning documents actually helps combat these problems so long as the Commission refers to them in a uniform fashion. The record does not indicate that the Commission acted arbitrarily or with prejudice when it judged Coffey's plan with reference to the goals of the SLRP.[15] Coffey provides no explanation why the Commission should not consider the SLRP other than the fact that it was not passed as an ordinance by the Assembly. We consider Coffey's argument too restrictive.

As the Utah Supreme Court has explained:

[Z]oning authorities are bound by the terms and standards of the applicable zoning ordinance, and are not at liberty to either grant or deny conditional use permits in *derogation of legislative standards.* Within the boundaries of

---

**14.** Although SACC makes a cogent argument that the SLRP could be considered an implementing "plan" or "policy tool" within the hierarchy of documents that make up Anchorage's Comprehensive Development Plan, we need not resolve this issue at this time. *See* AMC 21.05.-020–.025; AS 29.40.030 (the plan "may include, but is not limited to, ... statements of policies, goals and standards" etc.).

**15.** In his opening remarks, Coffey's representative, Mr. Sawhill, accepted the Commission's

authority to refer to the SLRP in making its decision. He stated that "The three sets of standards we are to meet are the general standards for conditional use in 21.50.020, the specific standards for natural resource extraction in 21.-50.0709(A)–(C), *and then the standards contained in Commission resolution 16–83 which adopts the [SLRP] with the attached standards of operations which were items 1–10.*" (Emphasis added.)

such standards, however, the zoning authority is afforded a broad latitude of discretion.

*Thurston v. Cache County*, 626 P.2d 440, 444–45 (Utah 1981) (emphasis added) (footnote omitted). Nothing in AMC 21.50.020 and .070 suggests that the planning goals of the SLRP are in derogation of the conditional use standards. Because AMC 21.50.020(C) requires the Commission to determine if the use "will be compatible with existing and planned uses in the surrounding neighborhood," it is reasonable for the Commission to refer to studies explaining what the "existing and planned uses" are. We, therefore, conclude that the Commission properly referred to the SLRP as a planning document in reviewing the permit application.

### 2. The Commission's Findings are Sufficient to Support the Permit Denial.

█ Although no ordinance requires the Commission to make specific findings of fact to support its conditional use decisions, we have held that zoning boards and other agencies making adjudicative decisions must articulate the reasons for their decisions. *See Kenai Peninsula Borough v. Ryherd*, 628 P.2d 557, 562 (Alaska 1981). We have explained:

> Such findings facilitate judicial review, insure careful administrative deliberation, assist the parties in preparing for review, and restrain agencies within the bounds of their jurisdiction.

*City of Nome v. Catholic Bishop of N. Alaska*, 707 P.2d 870, 875 (Alaska 1985). The test of sufficiency is thus a functional one: do the Commission's findings facilitate this court's review, assist the parties and restrain the agency within proper bounds?

█ The second set of factual findings issued by the Commission is certainly not a model of clarity. However, when we supplement the findings with the comments which the commissioners made on the record while they considered the permit application, their reasoning and conclusions become clear.

From the findings, we are able to conclude that the Commission determined that the proposed conditional use failed to comply with the standard set forth in AMC 21.50.020(C). Subsection (C) requires that the *conditional use* "will be compatible with existing and planned uses in the surrounding neighborhood and with the intent of its use district." [16] The findings indicate that Coffey proposed a "massive commercial natural resource extraction" which was in "inherent conflict" with the "adjoining residential land uses." When these statements are taken in conjunction with the commissioners comments at the public hearing, they suffice to explain the basis for the Commission's denial of the permit.

### 3. The Findings are Supported by Substantial Evidence.

█ The clearest evidence of the incompatibility of uses comes from the details of the gravel extraction plan itself. The project envisions 80,000 truck loads of gravel, one truck leaving every three minutes, six days a week, five months a year. It establishes five years of heavy industry next to a residential subdivision. The potential for dust, noise, cracked windshields, water contamination, and serious traffic accidents is easily established by the record.

The two uses are not made compatible simply by the fact that Coffey's plan calls for dust mitigation and provides the best possible truck routes with a number to call if the trucks pose a danger. As one commissioner noted, the many conditions imposed on the plan actually evidence its incompatibility with the surrounding area. Simply because "natural resource extraction" is permitted as a conditional use in R–2A areas doesn't mean that large-scale commercial mining must be permitted anywhere in the area so long as the mine

---

**16.** Coffey argues that because the Commission found that the goal of residential development was compatible with the surrounding neighborhood, his plan satisfied the standard in AMC 21.50.020(C). However, the ordinance plainly requires the "conditional use" (i.e. the gravel excavation) to be "compatible with existing and planned land uses." AMC 21.50.020(C).

operator takes every reasonable precaution to conduct the operation carefully. *See, e.g., Byrum v. Board of Supervisors,* 217 Va. 37, 225 S.E.2d 369, 373 (1976) ("No matter how reasonably a hog farm is administered, its very nature is going to make it incompatible with many other uses.").

Therefore, we hold that the Commission's decision was supported by substantial evidence. The superior court's decision is REVERSED.