*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ALLISON LEIGH, | ) | |
| | ) | Supreme Court No. S-17247 |
| Petitioner, | ) | |
| | ) | Alaska Workers' Compensation |
| v. | ) | Appeals Commission No. 18-014 |
| | ) | |
| ALASKA CHILDREN'S SERVICES | ) | O P I N I O N |
| and REPUBLIC INDEMNITY | ) | |
| COMPANY OF AMERICA, | ) | No. 7464 – July 10, 2020 |
| | ) | |
| Respondents. | ) | |
| | ) | |

Petition for Review from the Alaska Workers' Compensation Appeals Commission.

Appearances: Patricia Huna, Law Office of Patricia Huna, Anchorage, for Petitioner. Vicki A. Paddock, Meshke Paddock & Budzinski, Anchorage, for Respondents.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

BOLGER, Chief Justice.

## I. INTRODUCTION

A worker broke her ankle when she slipped and fell in her employer's icy parking lot. Following surgery she had a complicated recovery. Her employer began to controvert benefits related to the ankle about nine months after the injury. Three years after the injury, her employer requested that she sign a release allowing it to access all

of her mental health records for the preceding 19 years because of her pain complaints. The worker asked for a protective order from the Alaska Workers' Compensation Board. The Board's designee granted the protective order, and the employer appealed this decision to the Board. A Board panel reversed the designee's decision. The employee petitioned the Alaska Workers' Compensation Appeals Commission for review, but the Commission declined review. We granted the employee's petition for review. We hold that the statute permits an employer to access the mental health records of employees when it is relevant to the claim, even if the employee does not make a claim related to a mental health condition. We remand this case to the Board for further proceedings to consider reasonable limits on the release at issue here.

## II. FACTS AND PROCEEDINGS

Allison Leigh worked for Alaska Children's Services in February 2015 when she slipped on ice in the parking lot at work and broke her right ankle. She went to the emergency room and had surgery that day. Her recovery from the fracture has been complicated; she has had additional ankle surgeries and experiences continuing pain.

Leigh has several preexisting conditions not directly associated with her work injury. Her mental health records are at issue here; she has attention deficit disorder (ADD), anxiety, and a mood disorder, and takes medication for these conditions. The nurse practitioner who manages Leigh's psychiatric medications and acts as a mental health counselor submitted four records to the compensation carrier for payment in 2015. At that time Alaska Children's Services sent Leigh a request for releases of information that included disclosure of mental health treatment records, and it controverted the mental health counseling bills because Leigh's orthopedic doctor said "that mental health counseling is not related" to the ankle injury. Leigh said the bills for the mental health visits had been sent in error and petitioned for a protective order regarding mental health

records. At a prehearing conference she told the Board designee that she did not think her mental health counseling was related to the work injury. The Board designee ordered the employer to remove the language related to mental health from the releases and ordered Leigh to sign the releases after the changes were made.

In August 2015 Leigh had a second ankle surgery because of "loose bodies in the ankle joint." Her physical complaints continued following surgery. In November 2015 Alaska Children's Services controverted continuing temporary total disability (TTD) on the basis that Leigh was medically stable. The next month it controverted any disability benefits, stating that Leigh had turned down an offer of modified work.

In late 2015 and early 2016 Leigh and her employer began to discuss other medical treatments to resolve her ankle complaints. In January 2016 Leigh saw Dr. Scot Youngblood, Alaska Children's Services' doctor; he thought she was medically stable and had "disability conviction."[1] He evaluated several treatment options, none of which he endorsed. Dr. Youngblood thought Leigh had "multiple psycho-social factors at play," with subjective complaints that he "deemed in excess of objective findings." In February 2016 the employer controverted all further workers' compensation except medical benefits.

In April 2016 Leigh had another ankle surgery, which did not resolve her pain complaints. The surgeon referred her to Northern Anesthesia & Pain Medicine, where she saw Dr. Heath McAnally, an anesthesiologist and pain medicine specialist.

---

[1] Disability conviction is "a belief that because of chronic pain, one is unable to meet occupational, domestic, family, and social responsibilities, and to engage in avocational and recreational activities." Gerald M. Aronoff & Jeffrey B. Feldman, *Preventing disability from chronic pain: a review and reappraisal*, INT'L REV. PSYCHIATRY, May 1, 2000, at 158.

Dr. McAnally diagnosed Leigh with chronic pain, post-traumatic arthritis, neuraligia, and complex regional pain syndrome type I (CRPS). Dr. McAnally described CRPS as "a potentially debilitating neuropathic pain state" that is diagnosed using specific diagnostic criteria, the most accepted of which are "the Budapest criteria."

Dr. McAnally thought Leigh met the Budapest criteria. He continued to treat her for her pain complaints, and his chart notes show that she continued to see her psychiatric nurse practitioner and take psychotropic medication. Dr. McAnally said Leigh's CRPS was "definitely related to her workplace injury." His notes contained occasional comments indicating a correlation between Leigh's pain levels and stress from events in her life.

According to Dr. McAnally's October 2016 chart note, he planned a "biopsychosocial program focusing on the latter two components especially" with the hope that "significant ground [could] be made here in terms of forgiveness/releasing negative emotions and catastrophization that will facilitate physical symptom improvements." He later instructed her in "breathing and relaxation techniques" and wrote that "while chronic pain in general, and CRPS definitely contains significant psychosocial components, to declare that her condition is due to pre-existing psychiatric issues is . . . ridiculous."

In January 2017 Leigh filed a written workers' compensation claim for several benefits. Alaska Children's Services denied the claim. At a March 2017 Employer's Medical Examination (EME) Dr. Youngblood found "[n]o evidence" of CRPS and again diagnosed "[d]isability conviction." When asked whether he recommended "any evaluations by any other medical specialist for any reason," he answered, "No additional evaluations are indicated, recommended, or necessary. Multiple psycho-social issues continue to be present, but psychiatric treatment would not

be deemed to be related to the industrial injury . . . ." After the 2017 EME report, Alaska Children's Services controverted medical benefits as well.

The Board ordered a second independent medical evaluation (SIME) with Dr. Thomas Gritzka, an orthopedic surgeon, who saw Leigh in January 2018. He thought Leigh had, in addition to the conditions already identified, "a form of benign ligamentous hyper laxity[,] . . . a collagen disorder in the general family of Ehlers Danlos syndrome." He thought this syndrome "probably contributes to her disability and combines with her injury to cause her current disability and need for treatment." He noted that the injury happened "against a background setting of attention deficit disorder and depression" as well as the Ehlers Danlos syndrome. Dr. Gritzka did not agree with all of Dr. Youngblood's opinions, specifically rejecting his opinion that Leigh had no signs "that are consistent with some form of neurological or autonomic dysfunction." Dr. Gritzka thought Leigh met some, but not necessarily all of the criteria for CRPS.

Leigh asked for a hearing on her claim after the SIME report, and Alaska Children's Services opposed the hearing request. In its opposing affidavit, the employer asked that Leigh attend a psychiatric EME, saying it was "sending psychiatric medical releases" and needed more time "for discovery related to such." The day after it filed its affidavit opposing a hearing, it sent Leigh three releases for her mental health records. The releases authorized disclosure of all mental health records "from 1999 to the date of expiration of this release." The release cautioned that failure to sign the release or petition for a protective order "may result in suspension of benefits until the release is signed."

Leigh again petitioned for a protective order. At the March 13 prehearing conference, Leigh argued that she was not seeking mental health benefits and as a result the request for mental health records was "unfair and intrusive and violative of [her]

rights." Her attorney informed the Board and Alaska Children's Services that her ongoing counseling was related to childhood trauma.

Alaska Children's Services relied on medical records, including its EME reports, to argue that "there are psycho-social issues involved"; it also argued that Leigh's ADD medication interfered with her pain medication, which could impact the analysis related to disability. Leigh argued that broad disclosure of her records put Leigh and workers like her "in the situation of either giving up their claim or having [their] past revealed to the employer and the world," which was "a choice she shouldn't have to make." The Board designee granted the protective order and told Alaska Children's Services it could ask the Board to review the decision.

Alaska Children's Services petitioned the Board to overturn the protective order. While that petition was pending, Leigh had a bone scan that showed abnormalities. The parties also deposed Dr. Gritzka, who said the results of the bone scan "fulfill[] . . . the Washington Department of Labor and Industry criteria, for CRPS." In his opinion it confirmed "that there is still a painful problem in her ankle."

At his deposition Dr. Gritzka said psychological conditions can be a risk factor in the development of CRPS, but are not a cause of the condition. He thought psychosocial or psychological factors were an issue because he thought Leigh was not adapting well to her ankle impairment. He explained that people with psychological diagnoses can have problems adapting to an impairment. Dr. Gritzka recommended that Leigh be evaluated at a tertiary clinic where specialists in multiple disciplines could treat her as a team. He indicated a tertiary center would need access to all of her medical records, including records related to old injuries and her psychological records, including "all of her records going back to when she was a child basically."

Dr. Gritzka "would defer to the opinion of a psychiatrist or psychologist" as to the contribution of Leigh's psychosocial issues to her pain; he perceived Leigh as

"catastrophizing" and said it had been "exceptionally difficult" to get through Leigh's medical history with her. He testified, "I think she's got a physical problem with her ankle, no doubt. How she responds to it, that's a psychological or psychosocial issue. I think her response is a little atypical."

The Board held an oral hearing about the protective order in late July 2018. Leigh testified briefly at the Board hearing, and the parties had agreed the Board could consider Dr. Gritzka's deposition.[2] The hearing was mainly argument, with Alaska Children's Services asserting it had not raised a defense based on Leigh's mental health because it had been unable "to investigate that part of the claim." Its argument was based on the Board's liberal provision of discovery; it justified the request for access because of Leigh's psychiatric medication, her continuing pain complaints, her request to go to a specific treatment center, and Dr. Gritzka's comments about psychological issues impacting her adaptation to her impairment.

In response Leigh argued that Alaska Children's Services had known as early as 2015 that she was getting psychological treatment but had waited years to bring it up as an issue. She pointed out that the Board designee had granted a protective order in 2015 and said nothing had changed in her mental health counseling since then. She maintained she had numerous other medical conditions, and that Dr. Gritzka had indicated a tertiary clinic would need records related to all conditions, yet Alaska Children's Services sought only mental health records. Leigh contended that the Board decisions Alaska Children's Services relied on had all involved mental health claims and that she had purposely not included mental health claims in order to protect her privacy.

---

[2] Under AS 23.30.108(c) the Board "may not consider any evidence or argument that was not presented to the board's designee, but shall determine the issue solely on the basis of the written record." Neither party mentioned the procedural deviation here, and we do not discuss it further.

The Board decided that Leigh was required to sign the releases, although it required them to be "appropriately modified" to conform to its decision. The Board thought that because multiple doctors indicated that psychosocial issues were involved in Leigh's pain complaints, Leigh's mental health records were all discoverable even if they ultimately might turn out to be irrelevant. The Board made a specific finding about the 2016 EME report and its identification of "disability conviction" and "psychosocial factors." The Board cited *In re Mendel*[3] as well as a Board decision in which the employee had requested benefits for a mental health condition[4] to support its decision. It said the Board designee had abused his discretion because he had not considered "the medical evidence showing a reasonable nexus between [Leigh's] mental health issues and her continuing symptoms and disability." The Board thought it was reasonable to request records going back to 1999 because "it is within a few years of the date [Leigh] began receiving mental health treatment," when she was "approximately" eight years old. The Board noted that Alaska Children's Services had not "formally raised a defense based on mental health issues . . . because it had no release with which to obtain evidence to develop such a defense."

Leigh petitioned the Commission for review of the Board's decision. The Commission denied review. The Commission said Leigh's mental health records "would seem potentially to have bearing on her ankle injury" because physicians have expressed "concern about the impact of her mental health on her recovery." Noting our liberal

---

[3]     897 P.2d 68 (Alaska 1995) (summarizing standards for relevancy in civil proceedings and requiring some "nexus between the information sought" and an issue in the case).

[4]     *Rockstad v. Chugach Eareckson Support Servs.*, AWCB Dec. No. 08-0038 at 39-40 (Feb. 22, 2008) (requiring employee to sign release for mental health records when employee included a claim for "an injury related mood disorder").

interpretation of discovery rules, the Commission thought the request for "past counseling records" could lead "to discovery of admissible evidence relative to her injury and to the issues in dispute" because some doctors "indicated that future treatment might include a mental health component."

Leigh petitioned for review; we granted Leigh's petition and asked the parties to address two questions:

> (a) Can the Alaska Workers' Compensation Board require an employee to sign a release of information for mental health records pursuant to AS 23.30.107-.108 when the employee has not requested compensation related to the employee's mental health or otherwise directly put her mental health in issue? If the Board can do so, what limits, if any, can be imposed on the release?
>
> (b) To what extent, if at all, does *Harrold-Jones v. Drury*, 422 P.3d 568 (Alaska 2018) apply to discovery in workers' compensation proceedings?

## III. DISCUSSION

### A. The Board Can Require An Employee To Sign A Release For Mental Health Records Pursuant To AS 23.30.107 - .108 When The Employee Has Not Requested Compensation Related To The Employee's Mental Health Or Otherwise Directly Put Her Mental Health In Issue.

Releases of information in Alaska workers' compensation cases are governed by two statutes, AS 23.30.107 and AS 23.30.108. "We apply our independent judgment to questions of law that do not involve agency expertise, including issues of statutory interpretation."[5]

Alaska Statute 23.30.107(a) provides in pertinent part: "Upon written request, an employee shall provide written authority to the employer [or] carrier . . . to

---

[5] *Vandenberg v. State, Dep't of Health & Soc. Servs.*, 371 P.3d 602, 606 (Alaska 2016).

obtain medical . . . information relative to the employee's injury. . . . This subsection may not be construed to authorize an employer [or] carrier . . . to request medical or other information that is not applicable to the employee's injury." Alaska Statute 23.30.107(b) excludes medical records in the Board's and Commission's files from disclosure as public records under AS 40.25.100-.295, providing some privacy protection to injured workers.

Alaska Statute 23.30.108 deals with disputes about releases of information, setting up a summary process with specific deadlines. Subsection .108(a) requires an employee to either petition for a protective order or sign a requested release within 14 days. Alaska Statute 23.30.108(b) gives the Board's designee authority to resolve disputes about releases and requires the Board to set a prehearing conference within 21 days. Benefits may be suspended if a worker refuses to sign a release after the designee requires it.[6] Subsection .108(c) requires the Board's designee to "direct parties to sign releases . . . if the parties present releases . . . likely to lead to admissible evidence relative to an employee's injury," allows the Board to impose sanctions for failure to comply with discovery-related orders, and limits the evidence and argument that may be made when the Board reviews the designee's decision. Alaska Statute 23.30.108(c) requires the Board to uphold the designee's decision "except when the . . . designee's determination is an abuse of discretion."

To further protect workers' privacy, AS 23.30.108(d) allows an employee to ask the Board to "recover medical . . . information that has been provided but is not related to the employee's injury." If the Board or its designee grants the request, the administrative agencies involved in the workers' compensation process as well as the

---

[6]     AS 23.30.108(b).

parties must return the records to the employee.[7] Alaska Statute 23.30.108(e) permits the Board to limit medical information "that may be used by the parties to a claim." When the Board imposes a limit under AS 23.30.108(e), an employee is required to "provide or authorize the production of medical or rehabilitation information only to the extent of the limitations of the order." If information has already been produced that exceeds a Board-imposed limitation, the Board must "direct the party in possession of the information to return the information to the employee as soon as practicable."[8]

Leigh sought a protective order within the applicable time limit, and the Board's designee granted her request. After an oral hearing, the Board required her to sign modified releases. We asked the parties to address whether the Board can require an employee to produce mental health records when the employee has not requested compensation for a mental health condition or otherwise directly put her mental health at issue.

Leigh argues that we should construe the statute consistently with discovery cases in civil suits, contending that in personal injury cases a plaintiff needs to provide information related solely to medical conditions that a plaintiff puts in issue. She maintains that because she did not make a claim for mental health treatment, Alaska Children's Services has no reason to discover her mental health records. She analogizes her case to *Kennedy v. Municipality of Anchorage*, where we held that a civil litigant did not waive psychiatrist-patient privilege when he asserted a "garden-variety" mental anguish claim.[9] Relying on cases discussing the psychotherapist-patient privilege, she argues that this privilege serves important social purposes so that we should only allow

---

[7]     AS 23.30.108(d).

[8]     AS 23.30.108(e).

[9]     305 P.3d 1284, 1290-91 (Alaska 2013).

discovery of employees' mental health records when they themselves elect to put them in issue.[10]

Alaska Children's Services contends that under the new causation standard of AS 23.30.010(a), the Board needs to look at all possible causes of disability or need for medical treatment to determine whether work is the substantial cause. It maintains that we have interpreted relevance broadly in the discovery context and asserts that the Board has followed suit. It notes that Drs. Gritzka, Youngblood, and McAnally all indicated that there was some interaction between Leigh's pain complaints and her mental health condition. Alaska Children's Services argues that the Board can order release of mental health records when mental health "is playing a role in the benefits the employee seeks as part of her claim," not just when the employee asks for mental health benefits, and therefore that the Board correctly applied its prior cases when it required Leigh to sign the release.

"We interpret a statute 'according to reason, practicality, and common sense, considering the meaning of the statute's language, its legislative history, and its

---

[10]     Leigh did not explain her focus on the patient-psychotherapist privilege. While the Board has extended the rules of privilege to Board proceedings, *see* 8 Alaska Administrative Code (AAC) 45.120(e) (2011) ("The rules of privilege apply to the same extent as in civil actions."), AS 23.30.095(e) exempts from privilege "[f]acts relative to the injury or claim communicated to or otherwise learned by a physician or surgeon who may have attended or examined the employee." Leigh also did not raise in her brief concerns related to the applicability of counseling-related confidentiality statutes. *See* AS 08.29.200 (confidential communications between licensed professional counselors and clients); AS 08.63.200 (confidential communications between marital and family therapists and clients); AS 08.86.200 (confidential communications between psychologists and clients). Nor did she discuss the constitutional right to privacy, which the Board has considered germane in construing AS 23.30.108. *Jackson v. Food Ex Corp.*, AWCB Dec. No. 14-0019 at 12, 2014 WL 666940, at *12 (Feb. 18, 2014).

purpose.' "[11]  The statutory language in AS 23.30.107(a) requires an employee to authorize her employer to obtain medical information "relative to the employee's injury," but it also prohibits construing the provision to allow the employer to request medical information "that is not applicable to the employee's injury."

The statutory language of AS 23.30.107(a) suggests that the legislature intended to place some limits on access to claimants' medical records, and the legislative history supports this. A staff representative for Representative Rokeberg testified before a House committee about the amendment adding to AS 23.30.107(a) the sentence that "[t]his subsection may not be construed to authorize an employer [or] carrier . . . to request medical or other information that is not applicable to the employee's injury."[12] She indicated the language would limit what the adjuster could request "when an employee first files a request for benefits" and was intended to "put some sidebars" on adjusters sending forms "wanting to know 'everything.' "[13] Representative Rokeberg "said the intent was to prevent a 'fishing expedition' when an employee bumps a toe and has to give a whole life history."[14]

But the main purpose of the legislation amending the Act's provisions about obtaining releases and the Board's review of discovery disputes was to set up "a simple

---

[11]  *Vandenberg v. State, Dep't of Health & Soc. Servs.*, 371 P.3d 602, 606 (Alaska 2016) (quoting *Louie v. BP Expl. (Alaska), Inc.*, 327 P.3d 204, 206 (Alaska 2014)).

[12]  Minutes, Hearing on House Bill (H.B.) 419 Before the H. Labor & Commerce Comm., 21st Leg., 2d Sess. at Tape 00-37, Side A No. 0430 (Mar. 27, 2000) (testimony of Janet Seitz, staff representative to Rep. Norman Rokeberg).

[13]  *Id.*

[14]  *Id.* at No. 0526.

summary process for employers to obtain reasonable medical releases."[15]  As set out in the intent section of the bill, the legislature's intent (as relevant to this provision) was that "claimants provide releases of information that allow employers and insurers and their agents to obtain promptly information needed to investigate and adjust claims" and "medical information relevant to claims be discoverable and be promptly provided."[16] We therefore construe the statute in light of this purpose.

The definition of "relative" is "[h]aving pertinence or relevance; connected or related"[17] or "RELEVANT, PERTINENT."[18]  The Board has construed "relative" in AS 23.30.107(a) as essentially the same as "relevant" under the Alaska Civil Rules:  in a frequently cited Board case that predated the 2000 amendment, the Board decided "the definition of 'relevant' for discovery purposes in [Alaska] Civil Rule 26(b)(1) is persuasive as to the meaning and legislative intent of the phrase[] 'relative to employee's injury' . . . in AS 23.30.107(a)."[19]

We agree with the Board's construction of the statute and observe that AS 23.30.108(c) instructs the Board "to direct parties to sign releases . . . if the . . . releases . . . are likely to lead to admissible evidence relative to an employee's injury."

---

[15]    *Id.* at Tape 00-28, Side A No. 2275 (testimony of Paul Grossi, Dir., Div. of Workers' Comp.).

[16]    Ch. 105, § 1(7)-(8), SLA 2000.

[17]    *Relative* (adjective), THE AMERICAN HERITAGE DICTIONARY, https://ahdictionary.com/word/search.html?q=relative (last visited May 7, 2020).

[18]    *Relative* (adjective), MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/relative (last visited May 7, 2020).

[19]    *Granus v. William P. Fell, D.D.S.*, AWCB Dec. No. 99-0016 at 10, 1999 WL 806766, at *6 (Jan. 20, 1999).

This language is similar to that used in Rule 26(b)(1), which permits discovery of information "reasonably calculated to lead to the discovery of admissible evidence."

As the Commission and the Board both noted, we have construed discovery rules broadly. In *Ayuluk v. Red Oaks Assisted Living, Inc.*, for example, we agreed with the defendants that the plaintiff's entire medical record met "the discovery standard of relevance" because the plaintiff had put both her cognitive abilities and her emotional condition at issue.[20] And in civil cases as well as workers' compensation claims, pre-existing medical conditions can be relevant to a case even if the specific medical condition is not directly put in issue.[21]

The current causation standard in workers' compensation cases requires the Board to consider the relative contribution of different causes to determine whether a claim is compensable.[22] An employer has a right to develop defenses and discover information relevant to different possible causal factors in response to a worker's written claim. Here, even if Leigh did not directly make a claim for medical care or disability for a mental health condition, the medical records contain numerous references to the impact of her mental health conditions on treatment and possible disability related to her pain complaints. Dr. Gritzka testified that her treatment providers would need all of her medical records, and he deferred "to the opinion of a psychiatrist or psychologist" when

---

[20]     201 P.3d 1183, 1204 (Alaska 2009). We recognized that "a reasonable limitation in terms of the time of medical treatment could have been imposed." *Id.* n.55.

[21]     *Cf. Liimatta v. Vest*, 45 P.3d 310, 313-17 (Alaska 2002) (holding that plaintiff's pre-accident drug seeking condition was relevant to claim for loss of enjoyment of life and reversing trial court decision to exclude related evidence).

[22]     AS 23.30.010; *see also Morrison v. Alaska Interstate Constr., Inc.*, 440 P.3d 224, 238 (Alaska 2019) (describing current causation standard as "flexible" and "fact-dependent").

asked whether "any psychosocial condition" was related to Leigh's case, even though he himself thought there might be a relationship.

Leigh claims that nothing changed in her case between 2015, when she first sought and received a protective order, and 2018, when Alaska Children's Services asked the Board to review the second protective order, but this does not accurately characterize the record. The Board granted Leigh's first protective order only a few months after her fall, when the doctors evidently agreed that her mental health conditions were not an issue in her care or disability. Her medical condition changed after the first protective order was granted: she was first diagnosed with CRPS over a year later, and her treatment records with Dr. McAnally document emotional concerns as well as physical complaints in the course of several visits.

Even though Leigh did not directly seek compensation related to mental health benefits, the record contains multiple references to the impact her mental health conditions might have on her treatment as well as her pain complaints, which are part of her claim for both medical treatment and disability. The Board appropriately decided that Leigh's mental health records were potentially relevant to a defense.

**B.  The Board Can Impose Reasonable Limits On Releases.**

We also asked the parties to address what limits the Board can place on releases of information related to mental health records when an employee has not requested compensation related to her mental health. Leigh asserts that the Board should impose limits on releases when the employee requests it, and she asks us to order in camera review of her records. Alaska Children's Services contends that the Board appropriately limits releases in workers' compensation cases to two years before the date of either the injury or medical treatment "to the relevant body part or condition." It argues that the Board did not abuse its discretion here because Leigh began to see mental

health counselors when she was a child, and 1999 was "within a few years of the date Leigh began receiving mental health treatment."

We decline to delineate an explicit rule for the Board to follow in limiting medical releases for mental health records. The Board has discretion in ruling on discovery issues[23] and can, if it chooses, limit an employer's access to information in an employee's mental health records as it has done in other cases. The Board has required in camera review in some circumstances,[24] and it has also imposed restrictions on access to give an employee the opportunity to seek a protective order about specific records before the records are filed with the Board rather than after.[25] The Board also has limited the mental health conditions for which records must be disclosed.[26] The types of conditions and restrictions the Board placed on access to mental health records in other cases were related to the specific circumstances of the case.

---

[23] *See Dougan v. Aurora Elec. Inc.*, 50 P.3d 789, 793 (Alaska 2002) ("Discovery rulings are generally reviewed for abuse of discretion.").

[24] *Chapman v. Tom Thumb Montessori Schools*, AWCB Dec. No. 09-0209 at 15, 2009 WL 5841452, at *12 (Dec. 30, 2009); *Boling v. Municipality of Anchorage*, AWCB Dec. No. 06-0011 at 14, 2006 WL 151544, at *10 (Jan. 13, 2006).

[25] *Hall v. Alkota Plumbing & Heating*, AWCB Dec. No. 15-0057 at 9, 2015 WL 2339760, at *6 (May 13, 2015) (requiring employer's attorney to serve complete set of records on employee to allow employee to file protective order to exclude portion of records and prohibiting employer's attorney from giving records to client or filing them with the Board before the employee could file for a protective order).

[26] *Zimmerman v. Aurora Well Serv.*, AWCB Dec. No. 11-0150 at 31, 2011 WL 4795044, at *24 (Oct. 6, 2011) (limiting release to ADHD, depression, cognitive difficulties, and memory loss). The Board's designee has likewise limited releases to specific conditions. *See Stroup v. Central Peninsula Gen. Hosp.*, AWCB Dec. No. 12-0103 at 13, 2012 WL 2244836, at *2, *9 (June 14, 2012) (limiting release to "anxiety, stress, or panic disorder only").

It is unclear from the Board's decision here what factors the Board considered when it ordered Leigh to allow her employer access to years of mental health records.[27] The Board required that the release be "appropriately modified" but did not provide any details about specific modifications. For example, the Board did not discuss Leigh's concern that disclosure of her counseling records might impact her coworkers, nor did the Board indicate why disclosure of counseling records that included notes and bills from when Leigh was a minor and were related to childhood trauma would be necessary for evaluation of the compensability of her injury. Even if medical providers must access records for treatment or evaluation, the proposed release had no restrictions on re-disclosure and specifically stated the records were no longer subject to federal privacy protections. Leigh raised specific concerns during the proceedings that the Board did not address. The Board must on remand carefully scrutinize the information requested to determine whether it is overly broad, particularly with respect to the time period covered by the release. The Board should also consider restrictions on re-release of the information and should make an appropriate record for further appeal if necessary.[28]

---

[27] *See S. Anchorage Concerned Coal., Inc. v. Coffey*, 862 P.2d 168, 175 (Alaska 1993) (repeating rule that administrative adjudicative decisions "must articulate the reasons for their decisions" and should facilitate judicial review (citing *Kenai Peninsula Borough v. Ryherd*, 628 P.2d 557, 562 (Alaska 1981))).

[28] After the briefing was completed in this case, the Commission issued a decision addressing the applicability of *Harrold-Jones v. Drury*, 422 P.3d 568 (Alaska 2018), in workers' compensation cases. *The Home Depot, Inc. v. Holt*, AWCAC Dec. No. 261 at 14, http://labor.state.ak.us/WCcomm/memos-finals/D_261.pdf. We therefore dismiss that part of the petition related to *Harrold-Jones* as improvidently granted.

## IV. CONCLUSION

We VACATE the Board's interlocutory decision and REMAND for further proceedings consistent with this opinion.